**CITY OF TULLAHOMA, Plaintiff-Appellant,**

v.

**COFFEE COUNTY, TENNESSEE, Defendant-Appellee.**

**No. 15078.**

United States Court of Appeals Sixth Circuit.

Feb. 22, 1964.

684

Edwin F. Hunt, Nashville, Tenn., for appellant; Charles F. Hickerson, Tullahoma, Tenn., on brief.

Gerald L. Ewell and David W. Shields, III, Manchester, Tenn., for appellee.

Charles J. McCarthy, Gen. Counsel, Knoxville, Tenn., for amicus curiae Tennessee Valley Authority; Robert H. Marquis, Sol., on brief; C. A. Reidinger, Edgar H. Drum, Knoxville, Tenn., of counsel.

Before CECIL and WEICK, Circuit Judges, and WILLIAM E. MILLER, District Judge.

WILLIAM E. MILLER, District Judge.

Plaintiff-appellant, City of Tullahoma, Tennessee, appeals from a declaratory judgment in favor of defendant-appellee, Coffee County, Tennessee. The District Court held (1) that under the Tennessee Valley Authority Act of 1933, as amended, the City, which operates its own electric distribution system and purchases its electric power from the Tennessee Valley Authority, is obligated to pay to the County certain tax equivalents which are taken from revenues of the City's electric department and placed in its general funds, and (2) that under the Act the Tennessee Valley Authority is required to include in its contracts with cities provisions implementing such statutory obligation.

The Tennessee Valley Authority is authorized by Section 10 of the Act (16 U.S.C. § 831i) to sell its surplus power to states, counties, municipalities, corporations, partnerships and individuals, and to include in any contract for the sale of power " * * * such terms and condi-tions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this chapter, * * *."

The City obtains its electric power supply from TVA under a contract executed July 1, 1947. Section 6 of the contract provides that gross revenues from electric operations shall be first applied and used for certain purposes in a specified order of priority and that from the remaining revenues the City "* * * may thereafter pay into its General Fund a tax equivalent as provided * * * in the Schedule of Terms and Conditions attached hereto." Section 10 of the contract provides:

"It is hereby recognized and declared that, pursuant to the obligations imposed by the Tennessee Valley Authority Act of 1933 as amended, Municipality's operation of a municipal electric distribution system and Authority's wholesale service thereto are undertaken primarily for the benefit of ratepayers and that Municipality shall receive from the operation thereof for the benefit of its General Fund, to be used for any permissible municipal purpose, only (a) a return on any investment made from general funds in the electric system, and (b) an amount in lieu of taxes, representing a fair share of the cost of government properly to be borne by such system * * *."

Section 10(c) of the "Schedule of Terms and Conditions" which is made a part of the contract provides:

"Municipality may take from the electric department revenues or funds for the general funds of Municipality an amount in lieu of taxes (representing a fair share of the cost of government properly to be borne by its electric distribution system) to be determined subject to the terms and conditions hereafter stated.

"(1) To the extent surplus revenues are available, * * * Munici-

pality may take from the electric department revenues or funds for the general funds of Municipality an amount calculated by applying the prevailing municipal property tax rate to the value of the property used in the electric operations within the municipal limits.

"(2) To the extent surplus revenues are available, * * * Municipality may take from the electric department revenues or funds for the general funds of Municipality an amount calculated by applying the prevailing county and State tax rates to the value of the electric system; * * *."

Pursuant to the terms and provisions of the contract, the City takes from the electric system revenues for its general fund an amount calculated by applying the prevailing municipal and county property tax rates to the depreciated original cost of properties used in its electric operations. Sometime prior to the institution of this action, the County made demand upon the City for the sum of $27,892.76 taken from revenues of the electric system for the calendar year 1959 and placed in the City's general fund, an amount calculated by applying the county property tax rate to the depreciated cost of tangible property used in electric operations. The County based its demand upon the fourth paragraph of Section 13 of the Act, as amended in 1940 (16 U.S.C. § 831*l*). The first three paragraphs of that Section authorize and direct TVA to make certain payments in lieu of taxation to states and counties in which it has acquired properties previously subject to state and local taxation. The fourth paragraph, the interpretation of which is determinative of the present controversy, provides:

"Nothing herein shall be construed to limit the authority of the Corporation in its contracts for the sale of power to municipalities, to permit or provide for the resale of power at rates which may include an amount to cover tax-equivalent payments to the municipality in lieu of

State, county, and municipal taxes upon any distribution system or property owned by the municipality, or any agency thereof, conditioned upon a proper distribution by the municipality of any amounts collected by it in lieu of State or county taxes upon any such distribution system or property; it being the intention of Congress that either the municipality or the State in which the municipality is situated shall provide for the proper distribution to the State and county of any portion of tax equivalent so collected by the municipality in lieu of State or county taxes upon any such distribution system or property."

The City rejected the demand and instituted the present litigation for a declaratory judgment construing the Act and declaring the rights of the parties. The District Court concluded that the Congressional intent was:

"First: that all local governments involved, including the defendant County, should share in this third type of T. V. A. tax equivalent payments. Cf. Rutherford County v. City of Murfreesboro, 205 Tenn. 362, 326 S.W.2d 653;

"Second: that either the municipalities or the states of their situs should provide for the proper distribution of the respective local governments' share of the equivalent payments of the third type collected by the municipalities. 16 U.S.C. 831*l*; and

"Third: that (a) where neither the state legislature nor the affected municipality made provision for a proper distribution of such funds, and (b) contracts for the sale of electric power to municipalities at rates including an amount to cover local tax equivalent payments to such municipalities in lieu of local taxes upon the municipalities' electric systems are entered into between the Tennessee Valley Authority and such municipal corporations, then (c) such contracts must provide a proper

distribution by the municipalities of such amounts so collected by the cities."

In its Final Decree, the Court adjudged "that Coffee County has a right of action against the City of Tullahoma for the sum of $27,892.76 for the year 1959 on account of electric power tax equivalents paid into the City's general fund and not distributed to the County." In its memorandum opinion the Court stated that it had before it no formula from which to determine whether this amount is the "proper" distribution; that it could not conclude that either the General Assembly of Tennessee or the Tullahoma City Council would have considered that amount the "proper" distribution; and that in this situation resort would be made "to the only formula available to the Court, i. e., the one agreed to by the plaintiff City and the TVA in Section 10(c) (2) of the Schedule of Terms and Conditions of their contract, supra. The gist of this formula is that the tax equivalent involved shall be ' *  *  * an amount calculated by applying the prevailing county * * * tax rate * * * to the value of the electric system; * * *.' "

At the outset it must be conceded, we believe, that the meaning to be ascribed to the provision of Section 13 here involved is not free from doubt and that its language is ambiguous. On the basis of the text alone there would appear to be at least four views which might reasonably be taken as its meaning. One rendition is that while TVA is not required to include a contractual provision for tax equivalent payments and is not required in any event to determine the "proper" distribution of such payments by the municipality to the County, it nevertheless is obligated to refuse to "permit or provide" for tax equivalent payments unless provision has first been made for such distribution either by the State or by the municipality. Under this interpretation the distribution would be left entirely to the State or to the municipality in conformity with the expressed intention of Congress that the munici-

pality or State shall provide for the "proper" distribution of amounts collected by the municipality in lieu of State or County taxes. At the same time effect would be given to the words of the statute, "conditioned upon a proper distribution by the municipality of any amounts collected by it in lieu of State or county taxes * * *."

Another possible interpretation is that TVA has no obligation when entering into a contract with a municipality in permitting or providing for tax equivalent payments to determine that a proper method of distribution has been provided for either by the State or the municipality, and that its obligation is fully satisfied simply by including a provision in the contract that either the State or the municipality shall provide for such proper distribution, leaving the performance of this obligation entirely to the state legislature or to the municipality. Such an interpretation also would appear to give effect to the pertinent words of Section 13.

A third interpretation is the one adopted by the District Court:

"It is clear to the Court that the Congress placed a mandatory duty on T. V. A. to write a tax equivalent distribution provision into all contracts with municipalities of the nature under construction here unless the State in which the respective municipalities are situated has ' *  *  * provided for the proper distribution to the State and county of any portion of tax equivalent so collected by the municipality * * *,' or unless the municipality had previously and otherwise done so. As neither the State of Tennessee, contrary to its neighboring Commonwealth of Kentucky, nor the plaintiff City has made such provision, it was incumbent upon the Tennessee Valley Authority to include such a provision in its contract with the plaintiff City. The Tennessee Valley Authority did not do this. Its corporate 'person' ignored the plain provisions of the law under its erroneous interpreta-

tion of that law. *Rutherford County v. City of Murfreesboro, supra,* 326 S.W.2d 653, 656."

A fourth view of the statute (perhaps only slightly different from the second) is that Congress simply expressed a general intention that there should be a proper distribution of tax equivalent payments made to the states and counties, but did not undertake to implement such intention by imposing duties to that effect either upon TVA, the states, or upon municipalities, leaving this matter exclusively to local control or regulation. Under this view TVA would have no duty with reference to the proper distribution of tax equivalent payments but such distribution would be determined exclusively by the state or by the municipality itself. In the absence of such provision for distribution, the municipality would be entitled to retain the entire fund representing tax equivalent payments and no action would lie on the part of the County to recover any part of such payments.

It seems entirely clear, therefore, in view of the diverse and varied meanings and interpretations which may be ascribed to the statutory language that resort must be had to other aids in determining the Congressional intent. In light of the background of the provision, its legislative history, and contemporaneous and long continued administrative interpretation, coupled with the apparent acquiescence by Congress in such interpretation, we are persuaded that Section 13 must be construed in conformity with the fourth view set out above.

## BACKGROUND AND LEGISLATIVE HISTORY

Legislative history is an accepted aid in the interpretation of a federal statute and frequently is determinative of its meaning. *Harrison v. Northern Trust Co.,* 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407. The record shows that TVA, before the 1940 Amendment of Section 13 of the TVA Act, had included in its contracts with municipalities provisions for in-lieu tax payments, such contracts basically being the same as the contract with the City in the present case. Authority for including such provisions was derived from Section 10, as amended in 1935, authorizing TVA to sell its surplus power to states, counties and municipalities, and "to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this Act." Such contracts provided for the sale of electric power by TVA to municipalities at wholesale rates. One of TVA's chief concerns in accordance with the underlying philosophy of the Act was with the ultimate rates to the consumers. The determination of such rates was not left to the uncontrolled discretion of the municipalities. Provisions were inserted in its contracts which not only limited the price at which power supplied by TVA could be sold to the consumers, but also limited the use which the City could make of its electric revenues, the permitted uses including operating costs, interest on system indebtedness, reasonable reserves and working capital, and "tax equivalent payments into Municipality's general fund." It is clear from the record that in the TVA contracts entered into prior to the 1940 Amendment of Section 13 and resting entirely upon the authority of Section 10 as amended in 1935 (which section has never been subsequently amended), the distribution of tax equivalent payments was neither dictated, controlled, nor even provided for by TVA, being treated altogether as a matter for state or local determination. Under the terms of the contracts the tax equivalents were permitted to be placed in the City's general fund, but the determination of whether any portion of the fund should be distributed either to the State or to the County, and if so, the amount of such distribution, was not recognized as the duty or obligation of TVA but that of the state or municipality concerned.

As originally enacted in 1933, Section 13 of the TVA Act provided only for in-lieu tax payments by TVA to the states of Alabama and Tennessee. The original

version of the 1940 Amendment to Section 13 as introduced in the 75th Congress (S. 2925), provided that TVA should make payments only to the states, leaving to the states the function of distribution among counties and other subdivisions. The bill contained the following two paragraphs:

"The payments above provided shall in each case be made to the State not later than July 31 of each year, and it is the intention of the Congress that each State shall redistribute said payments or a portion thereof to counties and other local taxing districts affected by the program of the Corporation.

"It is likewise intended that each of the said States shall in like manner redistribute all payments made in lieu of taxation paid to municipalities by municipal authorities as provided in contracts made for the purchase of power from the Corporation [50a, Amendment to TVA Act Proposed by S. 2925]."

It seems clear that both as to redistribution of payments made by TVA to the states and the municipal in-lieu tax payments, the bill in this form merely expressed a general intent without imposing specific duties with reference to redistribution. As reported to the Senate the bill provided that a portion of the payments should be made directly by TVA to the counties in accordance with a formula set forth in the bill itself. This necessarily required elimination of the above paragraph dealing with such redistribution of payments by the states, and minor revisions of the paragraph dealing with municipal tax equivalent payments. The second paragraph dealing with distribution of payments in the latter category was revised to read:

"It is ~~likewise~~ in tended by Congress that each of the said States shall ~~in like manner redistribute~~ distribute all payments made in lieu of taxation paid to municipalities by municipal authorities as provided in contracts made for the purchase of power from the Corporation [86 Cong.Rec. 5247 (1940)]." [1]

The crucial language of Section 13 involved in this litigation was substituted for the above by an amendment offered on the floor of the Senate by Senator Hill of Alabama. When so offered the only discussion which occurred was as follows:

"Mr. Hill: I understand that this amendment also is agreeable to the Senator from Nebraska.

"Mr. Norris: Yes, I see no objection to it, and in fact I think it is a very good amendment. [86 Cong.Rec. 5247 (1940)]."

Further legislative history is correctly set forth in the amicus curiae brief of TVA as follows:

"Appellee, in its brief at pages 23–24, notes that the amendment was offered by Mr. Hill on behalf of the other Alabama Senator, Mr. Bankhead, and that it was one of 'two or three minor perfecting amendments' suggested by Mr. John W. Lapsley, who was counsel for the State Revenue Department of Alabama and had appeared both in that capacity and as personal representative of the Governor of Alabama in testifying during the committee hearings on S. 2925 [86 Cong.Rec. 5245 (1940)]. Appellee quotes excerpts from the committee hearings, apparently for the purpose of showing that Senator Norris agreed, in a colloquy with Mr. Lapsley during the hearings, that Congress should include in the legislation a requirement—rather than an expression of hope—that a portion of in-lieu tax payments by municipalities should be redistributed to counties, and that this must have been the purpose of the amendment offered by Senator Hill.

"In so doing, however, appellee omits what seems to us the crucial portion of the colloquy. At the mid-

---

1. Changes are indicated by underscoring words added and by marking through words deleted.

dle of page 22 of appellee's brief, there appears the following quotation of a remark made as a part of the colloquy by Senator Norris:

"Senator Norris. Nor the state either. Now, that is one of the difficulties we wanted to rectify and have put in this bill.

"This is followed in appellee's brief by a line of dots indicating omissions, and then by a later portion of the colloquy. Reference to the hearings indicates that Senator Norris' complete remarks and the pertinent part of the immediately following portion of the colloquy omitted from appellee's brief, were as follows:

"Senator Norris. Nor the State either. Now, that is one of the difficulties we wanted to rectify and have put in this bill. While we cannot legislate on that, being a State matter, we have gone so far as to state in here that it is the intention of Congress, which we did not state originally—it is the intention of Congress to do that very thing.

"Mr. Lapsley. Well, Mr. Chairman, you state that it is the intention of Congress that the State shall do what I had in mind, but you do not express the intention of Congress that the cities with whom T.V.A. contracts shall do the same thing.

"Senator Norris. Oh, yes; the States could provide by statute that when any municipality received anything in lieu of taxation, it should be subdivided just the same as though it was taxes—which we cannot say [Hearing on S. 2925 Before a Subcommittee of the Senate Committee on Agriculture and Forestry, 76th Cong., 3d Sess. 33 (1940)]."

It thus would appear that the sponsors of the amendment had no thought or intention that Congress itself was directly legislating to impose mandatorily on TVA, or upon the states or municipalities, the duty or obligation to provide for distribution of municipal in-lieu tax payments to the counties. As Senator Norris clearly stated, it was his view that Congress could not so legislate and that this was a matter of local or state control. If the amendment presented on the Senate floor, which was finally enacted, had been intended to have a different and more far-reaching effect to the extent that Congress itself should directly legislate to impose duties in this respect, it seems obvious that Senator Norris would not have stated that "it is a very good amendment," and Senator Hill would not have described it as a "minor perfecting" amendment.[2]

█ Also, if such had been the intent, it is difficult to understand why the sponsors of the amendment would have been willing to use such vague and indefinite terminology, especially since they had already provided in amending Section 13 a specific statutory formula for direct payment to states and counties of tax equivalents on properties owned by TVA. The conclusion appears clearly warranted that Congress considered that it had unquestioned authority to legislate directly as to the distribution of such payments made out of TVA funds and with respect to properties owned by TVA, but that it either could not or should not undertake to do so as to funds and properties owned by political subdivisions of the states.

█ The provision of Section 13 now under consideration, when viewed in the light of its background and history, and also in the light of the broad authority already conferred upon TVA under Section 10, was, in our view, intended pri-

2. "S. 2925, as amended in committee and on the Senate floor, was passed by the Senate and, though not passed as such by the House, was enacted into law as a rider attached by the Senate to the Emergency Relief Appropriations Act [54 Stat. 626–27 (1940)]" TVA Brief, Amicus Curiae, P. 13. Committee on Military Affairs had voted to table H.R. 7424, the House counterpart of S. 2925, and it was never considered on the floor of the House.

marily to make clear that the amendment of Section 13 as to payments of tax equivalents by TVA to states and counties should not be construed to impair or interfere with TVA's existing authority under Section 10 to permit or provide for such tax equivalent payments by municipalities. This view of its purpose finds support in the language of the provision itself. It is to be observed that it is not couched in terms as a grant of power or authority, nor is it written or composed in such way as to impose a duty or obligation. A purpose to preserve and continue intact the authority of TVA under Section 10 follows from the opening words of the provision that "[n]othing herein shall be construed to limit the authority of the Corporation in its contracts for the sale of power to municipalities, to permit or provide for the resale of power at rates" which may include tax equivalent payments in lieu of state, county and municipal taxes. As already stated, in exercising its authority under Section 10, it had been the uniform practice of TVA in contracting with municipalities to leave the matter of distribution of tax equivalents entirely to the states or municipalities concerned. If Congress had intended to change or alter such settled practice so as to control by Congressional fiat the matter of distribution of municipal tax equivalents, it is only reasonable to suppose that it would have amended Section 10 accordingly, or at least that it would have expressed its intention in direct and unmistakable terms.

## ADMINISTRATIVE INTERPRETATION

■ Of considerable weight and importance in determining the meaning of a statute is the interpretation given to it by those who are charged with its administration. County of Marin v. United States, 356 U.S. 412, 419, 78 S.Ct. 880, 2 L.Ed.2d 879; Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917; United States v. American Trucking Association, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345. There can be no doubt from the record that since the 1940 Amendment of Section 13, TVA has uniformly construed and interpreted it as making no change in the practice which had been followed by TVA prior to 1940 in contracting with municipalities as to municipal tax equivalent payments. Its view has always been, both before and after the 1940 Amendment, that the question as to whether the municipalities should make a distribution of tax equivalents to the counties, and if so, the formula to be used for making such distribution, were strictly matters of state or local control over which TVA had no authority. In its brief the City refers to the following established facts to support its view as to the administrative and contemporaneous interpretation of the 1940 Amendment.

TVA in its negotiations with cities concerning power contracts has advised such cities that they might retain all tax equivalents if they so desired. Some of the cities which entered into contracts for TVA power previously operated their own distribution systems, and in no case did these cities share their tax equivalents with counties. Generally, these cities, taking all tax equivalents possible under the TVA contract, including the so-called county tax equivalents, would receive less than they received prior to such contract. In Alabama and Mississippi, of 31 municipal distributors, not one shares its tax equivalents with the county. The state of Kentucky has a statute which requires its cities to share their tax equivalents with counties. In Tennessee, of the 57 municipal distributors, only 12 make a distribution to counties, some of them acting under special legislation which requires it. Only one of such distributors is known to make a payment to the county without special legislation. In all of its many power contracts with cities, TVA permits the city to take the total tax equivalents and place them in the city's general fund without sharing the same with the county, with the sole exception of Kentucky which has a state statute on the subject, as above noted.

## ACQUIESCENCE BY CONGRESS

The last paragraph of the 1940 Amendment to Section 13 directed TVA, not

later than January 1, 1945, to submit to Congress a report "on the operation of the provisions of this section * * *." The TVA Board, pursuant to this direction, transmitted its report to Congress by letter of December 22, 1944, such report dealing with the background and operation of Section 13 as re-written in 1940. With reference to "Tax and In-Lieu Payments by Local Distribution Systems," the report stated:

"The power contracts and agreements, through which the TVA exercises its responsibilities for the distribution of electric power, make provision for payments by municipal systems in lieu of state and local property taxes. These in-lieu payments are usually computed by applying the current property tax rates of each jurisdiction to the book value of the electric property within such jurisdictions.

"In the absence of state legislation or special local agreements to the contrary the entire state and local ad valorem property tax equivalent of each system is paid into the general fund of the owning municipality."

The report further stated:

"Taxes paid by cooperatives go to the states, counties, and cities in which the property is located. On the other hand, the equivalent of the former state and county taxes on municipally owned systems is commonly paid into the general funds of the municipalities owning the systems, and used for various municipal purposes."

In addition, the TVA Board, acting pursuant to an express requirement of Section 14 of the TVA Act, as amended (16 U.S.C. § 831m), filed annual reports with Congress. That section of the Act requires the TVA Board to file with each annual report copies of all power contracts entered into by TVA during the year. All of these annual reports since 1940, with the exception of the fiscal years, 1942, 1952 and 1953, have contained copies of one or more power contracts with municipalities, such contracts including provisions showing the TVA Board's construction of the relevant portion of Section 13.

▮ As pointed out in TVA's brief, although the TVA Act has been amended no less than seven times since 1940, and although Congress has been advised, both in a special report and in successive annual reports, of the TVA Board's construction of the 1940 Amendment, it has taken no action to annul or overturn, or in any way to modify such construction. In view of the information supplied by the TVA Board as to how the 1940 Amendment was being construed and applied, the failure of Congress to act, particularly over such a long period, is an important if not controlling factor in support of the construction of the amendment adopted and followed by TVA and its governing board.

The Supreme Court in Costanzo v. Tillinghast, 287 U.S. 341, 53 S.Ct. 152, 77 L.Ed. 350, dealt with the failure of Congress to act to change a long-continued administrative construction, and a rule was laid down which we think has direct application here:

"The administrative interpretation, as evidenced by the applicable Rules of the Bureau of Immigration adopted in 1917 and carried forward in later regulations, has been uniform to the effect that no time limitation is applicable in a case like the present. The failure of Congress to alter or amend the section, notwithstanding this consistent construction by the department charged with its enforcement, creates a presumption in favor of the administrative interpretation, to which we should give great weight, even if we doubted the correctness of the ruling of the Department of Labor" [287 U.S. p. 345, 53 S.Ct. 154, 77 L.Ed. 350].

Mention should be made of the contrary decision of the Supreme Court of Tennessee in Rutherford County v. City of Murfreesboro, 205 Tenn. 362, 326 S.W.2d 653, cert. den. 361 U.S. 919, 80 S.Ct.

257, 4 L.Ed.2d 187. In that case the Court stated that the determinative question was the proper construction of the 1940 Amendment to Section 13 of the TVA Act, the contract involved being substantially identical to the contract before us and having been entered into subsequent to the 1940 Amendment. The Court interpreted the Amendment in accordance with the County's contention in the present case and contrary to the interpretation of the TVA and of the City, holding that while TVA under the Amendment has discretion either to include or to omit a provision for tax equivalent payments, if such provision is included, it must be conditioned upon a proper distribution by the municipality of any such amounts collected in lieu of state and county taxes. It was further held that the Amendment required the municipality to distribute tax equivalents to states and counties fairly and as replacement of lost taxes. It is to be observed that the case was disposed by overruling a demurrer filed by the City of Murfreesboro to the bill of complaint of Rutherford County in which a construction of the Amendment was sought. From the opinion it is clear that the Supreme Court did not have before it the facts, so clearly developed in the present case, showing the consistent administrative interpretation of the Amendment by TVA, and the special and annual reports as to the operation of the Amendment made by the TVA Board directly to Congress. Also, an examination of the opinion discloses that the Court did not refer to the legislative history of the Amendment, history which we deem to be of special significance in this case in view of the ambiguity of the statutory provision involved. While the decisions of the highest court of a state on federal questions (admittedly not binding on a federal court) are entitled to consideration and are many times persuasive, for the reasons stated, we feel that the result reached in this instance by the Supreme Court of Tennessee should not be followed.[3] It is true that the Supreme Court of the United States refused to review the decision by denying certiorari. However, such denial may, as suggested by the City, be accounted for by the fact that the decision was not final, requiring a remand to the trial court for further proceedings to determine the amount of the County's recovery. In any event, such denial of certiorari implies no opinion or decision by the Supreme Court on the merits of the case.

For the reasons stated herein the judgment of the District Court is reversed and the action is remanded to that Court for entry of judgment in accordance with this opinion.

WEICK, Circuit Judge (dissenting).

With all due respect, I do not believe that Congress ever intended the result reached here. As I read the 1940 amendment to Section 13, no obligation was imposed upon TVA to provide for tax equivalent payments in its contracts with municipalities, but if such payments are provided they must be "conditioned upon a proper distribution by the municipality of any amounts collected by it in lieu of State or county taxes upon any such distribution system or property * * *."

The majority's holding in this case permits a municipality to include in the rates, which it charges to users of electricity, sums in lieu of county taxes when in reality they are for no such purpose, but are used by the municipality for its own purposes. In my judgment, this constitutes not only a misrepresentation to the consuming public if the sums were not intended to be used for the purpose for which they were charged and collected, but also a conversion of funds which in equity and good conscience be-

---

3. The Supreme Court of Tennessee had previously held in Rutherford County v. City of Murfreesboro, 202 Tenn. 455, 304 S.W.2d 635, in a case involving a TVA contract entered into prior to the 1940 Amendment of Section 13, that a city distributing TVA power to consumers was not required either by the state law or the TVA contract to share with the county tax equivalent payments which the city took into its general fund.

long to the county. To allow such a windfall to the municipality does violence to the manifest purpose of tax equivalent payments. State and county governments are just as much entitled to receive their distributive share of tax equivalents as municipalities.

When Congress authorized the TVA to acquire property previously subject to state, county and local taxation, a specific formula was enacted in Section 13 to provide recompense for the loss of taxes to the states and local governments. Cf. T.V.A. v. Polk County, D.C., 68 F. Supp. 692, aff'd 158 F.2d 96 (CA 6). The in-lieu-of-tax payments were so formalized that the Act even directed that payments be in equal monthly installments.

We are here concerned, not with property acquired by TVA, but with distribution facilities and systems owned by a municipality. The TVA was empowered by the statute to make contracts which provide for "tax-equivalent payments to the municipality in lieu of State, county and municipal taxes upon any distribution system or property owned by the municipality * * *."

As stated in the 1941 Annual Report of TVA at page 24: "It remains for the municipalities or the state legislatures to devise formulas for distributing a portion of these funds back to the counties and the states." The municipality was obligated to devise the formula in negotiations with the county and state. One guideline, which may be considered in the negotiations, would be the prevailing county and state tax rates on the value of the electric system. The formula used by one municipality might not be identical with that of another, but this does not preclude devising it. In my opinion, the Act, as a condition subsequent to the tax equivalent payments to the municipality, mandates a distribution to the county and state of their respective tax equivalents initially collected by the municipality.

The requirement of distribution is not contrary to other provisions of the Power Contract between TVA and appellant. Clause 6 enumerates the priority of the disposition of revenues from the municipality's electric operations.[1] Tax equivalent payments are placed fifth.

The Schedule of Terms and Conditions in the contract provided the manner in which the tax equivalents should be taken from the electric system's revenues and placed in the municipality's general fund. Paragraph 10(c) (2) allows the municipality to receive and distribute an amount "calculated by applying the prevailing county and state tax rates to the value of the electric system." The municipality is specifically prohibited however from distributing to the county and state in-lieu-of-tax payments that "would exceed the amount derived by applying the prevailing county and state tax rates to the value of the electric system." (Paragraph 10(c) (2))

The distribution of tax equivalents is not absolute, but conditional. Unlike the

1. 6. Disposition of Revenues: Municipality agrees to dispose of its gross revenues from electric operations in the following manner:

(a) Revenues shall first be used for the payment of all current operating expenses, including salaries, wages, cost of materials and supplies, power at wholesale, and insurance.

(b) From remaining revenues Municipality shall next currently provide for the payment at maturity of interest accrued on all System Indebtedness, and for amortization charges and/or sinking fund payments thereon.

(c) Thereafter, revenues shall be used currently to set up reasonable reserves for replacements, new construction, and contingencies, and to provide a reasonable amount of cash working capital.

(d) From remaining revenues Municipality may thereafter pay into its General Fund a return on its investment, as provided in the Financial and Accounting Policy in the Schedule of Terms and Conditions attached hereto.

(e) From remaining revenues Municipality may thereafter pay into its General Fund a tax equivalent as provided in the Financial and Accounting Policy in the Schedule of Terms and Conditions attached hereto.

694

statutory payments by TVA in the initial part of Section 13, the tax equivalents by the municipality to the county or state are subject to numerous contingencies. For example, tax equivalents could not be withdrawn if the electric system operated with a deficit or failed to satisfy the prior obligations of Clause 6(a)–(d), supra.

Allowing the municipality to withdraw and retain an amount covering tax equivalents in lieu of the state and county taxes without a distribution thereof was, in my opinion, neither intended nor sanctioned by Section 13. When the parties contracted and thereby incorporated all provisions of the TVA Act, as amended,[2] the municipality accepted the benefits, as well as the responsibilities, one of which was to fashion a distribution formula of tax equivalents to the county and state.

I think a formula was devised by the City of Tullahoma when it included in its rates the sums in lieu of Coffee County taxes. True, it did not negotiate this formula with the county, but it is clear that the county acquiesced therein by demanding the sums to which it was entitled thereunder. Upon the collection of these sums, it became the duty of the municipality to distribute them to Coffee County.

In my judgment, the Supreme Court of Tennessee correctly interpreted the statute in Rutherford County v. City of Murfreesboro, 205 Tenn. 362, 326 S.W.2d 653, cert. denied 361 U.S. 919, 80 S.Ct. 257, 4 L.Ed.2d 187. While the denial of certiorari by the Supreme Court does not constitute an affirmance or even approval of the judgment, I feel certain that the Supreme Court would have acted in the case if it believed that the TVA statute, 16 U.S.C. § 831*l*, had been grossly misapplied by the state court.

I would affirm the judgment of the District Court.

2. The contract, in part, provided: "Now, therefore, for and in consideration of the mutual covenants herein contained and subject to all of the provisions of the

Tennessee Valley Authority Act of 1933 as amended, the parties hereto mutually covenant and agree as follows.. * * *"