ILLINOIS CENTRAL RAILROAD COMPANY, Plaintiff-Appellant,

v.

TENNESSEE VALLEY AUTHORITY, American Commercial Barge Lines, and Cable Belt Conveyors, Inc., Defendants-Appellees.

UNITED STATES of America ex rel. TENNESSEE VALLEY AUTHORITY, Plaintiff-Appellee,

v.

A CONVEYOR BELT EASEMENT AND RIGHT OF WAY OVER TWO TRACTS OF LAND Containing a Total OF 0.26 ACRE, MORE OR LESS, IN UNION COUNTY, KENTUCKY, Illinois Central Railroad Company, et al., Defendant-Appellant.

Nos. 20846, 20867.

United States Court of Appeals, Sixth Circuit.

June 30, 1971.

York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Lively M. Wilson, Louisville, Ky., for appellants; W. Robinson Beard, Stites & McElwain, Louisville, Ky., Thomas E. Sandidge, Sandidge & Sandidge, Owensboro, Ky., on brief.

Thomas A. Pedersen, Sol., Tennessee Valley Authority, Knoxville, Tenn., for TVA; Robert H. Marquis, Gen. Counsel, Justin M. Schwamm, Tennessee Valley Authority, Knoxville, Tenn., on brief.

J. Robert Hard, Jeffersonville, Ind., E. Gerry Barker, Curtis & Rose, Louisville, Ky., for American Commercial Barge Lines and Cable Belt Conveyors, Inc.

Before MILLER and KENT, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

These two appeals brought by Illinois Central Railroad Company arise from the condemnation of an easement by TVA in property owned by the appellant railroad in Union County, Kentucky outside the Tennessee river watershed. Appeal No. 20,846 is from dismissal of an action brought by appellant in the district court in anticipation of the condemnation to obtain a declaratory judgment that the proposed exercise of eminent domain by TVA is unauthorized by law and therefore a violation of the fifth amendment. Appeal No. 20,867 is from a judgment entered by the district court in the condemnation action granting the easement and right of way to TVA over the appellant's lands in Kentucky. Because of the identity of the substantive issues in both appeals the cases were consolidated for disposition before us.

TVA filed a Notice and Declaration of Taking and a complaint for condemnation of the easement in appellant's lands

on May 22, 1970. Appellant filed its declaratory judgment action on March 19, 1970. In that action TVA and the two corporate defendants made motions to dismiss, which were sustained by orders of June 2 and June 4, 1970. Further findings were filed on June 16, 1970. A final order was entered on June 17, 1970, holding that TVA had constitutional and statutory authority to engage in the project for which the easement was to be condemned and to acquire the easement by purchase or condemnation. Since appellant had adequate opportunity to raise and did in fact raise all of its objections to the proposed taking in its defense of the condemnation action, which was pending at the time these orders were entered by the district court, we turn to a consideration of the validity of the taking by TVA in the condemnation proceedings (No. 20,867).

In 1967 coal reserves belonging to the United States at Camp Breckinridge, Kentucky, were transferred to TVA by authority of the President.[1] The actual authority to order such transfers was delegated to the Director of the Bureau of the Budget in 1965.[2] In ordering the transfer the Director found, in the statutory language, that "[t]he above transfers are deemed necessary and proper for the purposes of the Tennessee Valley Authority * * *."[3] This transfer was part of a continuing search for adequate coal reserves to supply the steam generating plants operated by TVA. The Breckinridge reserves, as well as most of the coal reserves acquired by TVA since 1960, are located outside both the watershed of the Tennessee River and its tributaries, and the area in which TVA is a principal supplier of electricity.[4]

In November, 1969, TVA entered into a 20-year contract with appellee American Commercial Barge Line Company for portage of coal from the Camp Breckinridge reserves to three TVA steam generating plants, principally the Cumberland Plant in Tennessee, the Shawnee Plant in Kentucky, and the Johnsonville Plant in Tennessee. The coal is to be mined by the Peabody Coal Company at two mining camps on the reserve. The contract calls for transportation of the coal by a coal conveyor belt to be constructed from the mines running approximately ten miles overland to a barge facility on the Ohio River near Uniontown, Kentucky, and thence by barges to the respective steam plants. The appellee barge company agreed to furnish, install, maintain, and operate the conveyor belts, one from the main mine to the river and another from the second mine to join the first belt. It also agreed to provide the barge loading facility and appurtenant storage area at the Ohio River terminus of the main conveyor belt. TVA agreed to furnish rights of way for the construction of these facilities. Pursuant to this agreement an easement was condemned for the conveyor belt over lands owned by appellant in Kentucky. The final judgment entered in the district court in the condemnation action awarded a stipulated amount of $150 for the interests of appellant so taken.

---

1. 16 U.S.C. Sec. 831f(b) reads in pertinent part:

> (b) The President of the United States is authorized to provide for the transfer to the Corporation of the use, possession, and control of such other real or personal property of the United States as he may from time to time deem necessary for the purposes of the Corporation as herein stated.

2. Exec. Order No. 11250 Sec. 1(15), June 28, 1965, 30 Fed.Reg. 8447, following 3 U.S.C.A. Sec. 301 (Supp. 1971).

3. 32 Fed.Reg. 10121 (1967).

4. 1970 TVA Ann.Rep. 29. Acquisitions are reported to the Congress and the President in the annual reports required by 16 U.S.C. Sec. 831h. These reports are subject to judicial notice, *see* United States ex rel. Tennessee Valley Authority v. An Easement and Right of Way over Land in Logan County, Kentucky, 246 F.Supp. 263 (W.D.Ky.1965), and City of Tullahoma v. Coffee County, 328 F.2d 683 (6th Cir. 1964).

Appellant's ultimate argument in opposition to the present taking is succinctly stated in its reply brief:

Perhaps the proper resolution of this case may be to acknowledge that TVA possesses the powers of a private business corporation when it chooses to conduct outside of its region affairs which Congress did not specifically authorize in the Act. The general corporate powers contained in 16 U.S.C. Sec. 831c, subsections (a)–(g), not being specifically keyed to the stated purposes of the Act, would follow the TVA wherever it wished to conduct business, be it Texas, Pennsylvania or Alaska. * * *

When it seeks to exercise the sovereign power of eminent domain, however, then it must accept the limitations of area and purpose which the Act imposes. The concept of a regional agency utilizing the power of eminent domain to deprive private citizens of another region of their property is repugnant to the TVA Act and to the Fifth Amendment to the Constitution.

Appellant concedes that TVA may acquire property by condemnation outside the Tennessee Valley watershed for transmission lines, but argues that its power of eminent domain to acquire property for other purposes outside such area has not been conferred by statute.

We are unable to agree with this narrow conception of the power of eminent domain conferred upon TVA by statute to accomplish its broad purposes. The scope of the power was considered by the Supreme Court in United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 553–554, 66 S.Ct. 715, 718, 90 L.Ed. 843 (1946):

The broad responsibilities placed on the Authority relate to navigability, flood control, reforestation, marginal lands, and agricultural and industrial development of the whole Tennessee Valley. The T.V.A. was empowered to make contracts, purchase and sell property deemed necessary or convenient in the transaction of its business, and to build dams, reservoirs, transmission lines, power houses, and other structures. It was particularly admonished to cooperate with other governmental agencies—federal, state, and local—specifically in relation to the problem of "readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisition of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the Act." All of the Authority's actions in these respects were to be directed towards "development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this Act * * * all for the general purpose of fostering an orderly and proper physical, economic, and social development of said areas. * * * " To discharge its responsibilities the T.V.A. was granted "such powers as may be necessary or appropriate" for their exercise. Section 4(h) of the Act gives the T.V.A. the very broad power to "exercise the right of eminent domain. * * * " Section 4(i) of the Act empowers the Authority to condemn certain specified types of property and concludes by referring to "all property that it [the Authority] deems necessary for carrying out the purposes of this Act. * * * " To make clear beyond any doubt the T.V.A.'s broad power, Congress in Section 25 authorized the Authority to file proceedings, such as the ones before us, "for the acquisition by condemnation of any lands, easements, or rights of way which, in the opinion of the Corporation, are necessary to carry out the provisions of this Act."

All of these provisions show a clear Congressional purpose to grant the Authority all the power needed to acquire lands by purchase or by condemnation which it deems necessary for carrying out the Act's purposes.

These proceedings were preceded by a T.V.A. resolution that it did deem these acquisitions necessary for such purposes. Despite Congress' clear expression of its purpose to grant broad condemnation power to T.V.A. we are asked to hold that the Authority's power is less than the powers to condemn granted other governmental agencies, which under 40 U.S.C. § 257 have been held to have a power to condemn coextensive with their power to purchase. Hanson Lumber Co. v. United States, 261 U.S. 581, 587 [43 S.Ct. 442, 67 L.Ed. 809].

*See also* United States ex rel. Tennessee Valley Authority v. An Easement and Right of Way over Land in Logan County, Kentucky, 246 F.Supp. 263 (W.D.Ky. 1965), and this Court's affirmance, 375 F.2d 120 (6th Cir.1967).

It would do violence to the statutory powers thus granted to confine TVA in the acquisition of properties by condemnation deemed necessary to accomplish its exceedingly broad purposes to the so-called Tennessee River watershed or to the Tennessee River and its tributaries. Clearly there is no express limitation in the Act to this effect, with three exceptions not applicable here. Section 4(j) of the Act (16 U.S.C. Sec. 831c) restricts the power to construct "dams, and reservoirs," to "the Tennessee River and its tributaries, * * *," and Sec. 12 (16 U.S.C. Sec. 831k) limits the construction of transmission lines "within transmission distance from the place where generated. * * *" A limitation is also imposed on TVA's power service territory by Sec. 15d(a) (16 U. S.C. Sec. 831n–4) which provides that no contracts "for the sale or delivery of power which would have the effect of making the Corporation or its distribu-

tors, directly or indirectly, a source of power supply outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957, and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area. * * *" Such statutory limitations, relating to flood control, navigation, and the supplying of electric energy, cannot reasonably be construed as territorial limitations upon the broadly-granted power of TVA to acquire other properties outside the Tennessee Valley or its legitimate service area needed to accomplish its statutory purposes within these boundaries.[5] TVA has consistently acquired properties of many descriptions beyond these geographic confines to promote its valid functions and has administratively construed the Act to permit it to do so. Of these acquisitions Congress has been advised by annual reports statutorily required to be submitted. Such long-continued administrative construction coupled with the failure of Congress to act to change it "creates," as the Supreme Court has explicitly pointed out, "a presumption in favor of the administrative interpretation. * * *" Costanzo v. Tillinghast, 287 U.S. 341, 345, 53 S.Ct. 152, 154, 77 L.Ed. 350 (1932). *See also* City of Tullahoma v. Coffee County, 328 F.2d 683 (6th Cir. 1964), cert. denied, 379 U.S. 989, 85 S.Ct. 698, 13 L.Ed.2d 609 (1965).

■ We find, therefore, that in acquiring private property by condemnation for its legitimate statutory purposes the TVA is not limited to the Tennessee Valley watershed nor to its power supply area as defined by statute.[6]

---

5. As the district court stated in United States ex rel. Tennessee Valley Authority v. An Easement and Right of Way over Land in Logan County, Kentucky, 246 F. Supp. 263 (p. 266), in an opinion later affirmed by this court, 375 F.2d 120 (6th Cir. 1967): "The statute only restricts TVA from entering into contracts for sale and delivery of power so as to make TVA a source of power outside the area. This

does not preclude TVA from constructing facilities outside the area to provide sources of power to be used inside the area."

6. This conclusion is buttressed by the sweeping mandate of Sec. 31 of the Act (16 U.S.C. 831dd) that:

This Act shall be liberally construed to carry out the purposes of Congress

The remaining question is whether the acquisition of the easement in Kentucky for the construction of a conveyor belt, under the circumstances of this case, may be regarded as a valid public purpose so as to justify the exercise of the power of eminent domain. On this point we think it is clear that it is for the administrative agencies vested with the power to acquire property by condemnation, and not for the courts, to decide what properties are needed to accomplish statutory or public purposes. This proposition the *Welch* case, *supra*, makes clear beyond cavil:

> * * * it is the function of Congress to decide what type of taking is for a public use and * * * the agency authorized to do the taking may do so to the full extent of its statutory authority. *Id.*, 327 U.S. at 551–552, 66 S.Ct. at 717.

As *Welch* specifically holds a taking by condemnation is for a public purpose if "Congress authorized the Authority to acquire, hold, and use the lands to carry out the purposes of the T.V.A. Act." *Id.* at 552, 66 S.Ct. at 718.

The same principle was well-stated by the district court in United States ex rel. Tennessee Valley Authority v. An Easement and Right of Way over Land in Logan County, Kentucky, 246 F.Supp. 263, 270 (W.D.Ky.1965):

> The necessity, expediency, location, design, method of operating, and what property is needed for the facilities which comprise the TVA system, including Paradise Steam Plant [outside the Tennessee River watershed] and the transmission line involved in this case, are matters for administrative and legislative determination which are not subject to judicial review [citing numerous Supreme Court rulings, including *Welch, supra,* and Ber-

man v. Parker, 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. 27] (1954)].

The project for a coal conveyor is designed primarily for delivery of coal to the Cumberland Steam Plant now under construction near Cumberland City, Tennessee. The TVA owns and operates a large number of steam plants for generating electricity, some located on property within and some outside the Tennessee Valley watershed. The operation of steam plants in conjunction with hydro-electric generating plants at TVA dams is designed to serve the ever-increasing power needs of the TVA region. In an opinion later affirmed and adopted by this Court, the district judge in the *Logan County, Kentucky* case, *supra,* considering whether certain steam plants in Kentucky, outside the Tennessee Valley watershed, were part of an interrelated steam and hydro-electric plant system so as to come within the TVA Act, explained the desirability of such interrelated plants and the relationship of coal supply and location to the economies of power generation for a large area and number of users:

> The best result in supplying power is the use of a combination of hydro-electric plants and steam plants, since they complement and supplement each other. The increasing power needs of the TVA region necessitated the construction of the Paradise steam plant which was placed at that location (Paradise, Kentucky) in order to supply current from the most economical source to a particular region. The decision was based on economic factors and engineering technical knowledge. Among the economic factors were the availability of coal, the cost of the connecting facilities, the adequacy of a cooling water supply, the availability of rail, water and road transporta-

---

to provide for the disposition of and make needful rules and regulations respecting Government properties entrusted to the Authority, provide for the national defense, improve navigation, control destructive floods, and promote interstate

commerce and the general welfare, but no real estate shall be held except what is necessary in the opinion of the board to carry out plans and projects actually decided upon requiring the use of such land.

tion, and, from the standpoint of the engineers, the suitability of foundation conditions. The placement at this location effected a two-thirds cost saving in coal in comparison with placement anywhere else in the TVA system. *Id.,* 246 F.Supp. at 265.

In its 1970 report to Congress and the President, TVA cited additional economies with respect to supplying coal to its plants by a conveyor-barge system:

TVA chose the conveyor-barge method of transportation over the alternative modes because it will result in the lowest net delivered cost of the coal and because it provides the greatest assurance of timely and uninterrupted deliveries. Savings to TVA from the conveyor-barge combination over a rail-barge combination are estimated at more than $3 million over the life of the mining and transportation contracts. Savings over an all-rail movement are estimated at more than $40 million. The reliability of the conveyor belt was another important consideration, particularly in light of the shortage of rail cars and the continuing threat of railroad strikes (1970 Annual Report, at 32).

■ TVA has argued persuasively that the coal mining and shipping operations are a necessary incident to the power generating operations at the plants in question, which are authorized by the Act. We think TVA has authority to mine and ship coal from its reserves as an integral part of its generating operations and to construct the facilities necessary for these functions.

■ The Supreme Court admonished twenty-five years ago that in deciding whether a particular taking is for a public purpose, courts must not parse a single "inseparable transaction" into discrete parts, but rather should "view the entire transaction as a single integrated effort on the part of T.V.A. to carry on its congressionally authorized functions." United States ex rel. T.V.A. v. Welch, *supra,* 327 U.S. at 552–553, 66 S.Ct. at 718. We are satisfied that shipment of the coal at Camp Breckinridge is an integral part of the operation of the steam plants. It cannot logically be said that while the acquisition of the coal is necessary for the effectuation of the purposes of the Act, provision for its shipment is not a public purpose.

We are not unmindful that Congress has expressed concern lest TVA expand its operations beyond a specific geographical region. Yet the statutory amendments providing for limitations and their legislative history scarcely support appellant's position here. The contrary is true. In 1959 the Act was amended by adding section 15d, 16 U.S. C. Sec. 831n–4, to permit TVA to finance its power program by selling bonds. This section has since been amended twice to increase the amount of the outstanding debt that could be incurred. Pub.L. 89–537, 80 Stat. 346, August 12, 1966; Pub.L. 91–446, 84 Stat. 915, October 14, 1970. It is provided that proceeds so raised may be used "for other purposes incidental" to performing the power generating and transmitting functions authorized by the Act. 16 U.S.C. Sec. 831n–4(a). If, as we think, the Act does not bar TVA from constructing facilities outside the Tennessee Valley, and the mining and shipping of coal is a necessary incident to the power generating function, then this amendment strengthens our view that the TVA has the authority to provide the facilities which it finds necessary to perform its functions.

The Supreme Court in 1968 dealt with what it termed the difficult problem of defining the TVA power supply area limited by the 1959 Amendment (Sec. 831n–4(a)), to the power supply area of July 1, 1959, and reviewed the legislative history of the 1959 Amendment to determine the location and extent of this area.[7] The Court said

---

7. The legislative history of the 1959 Amendment may be found in 1959 U.S.Code, Cong. & Adm.News, 2000 et seq.

Although discussions of the territorial limitation mentioned a number of policy reasons for the restriction, it is clear and undisputed that protection of private utilities from TVA competition was almost universally regarded as the primary objective of the limitation. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 7, 88 S.Ct. 651, 655, 19 L.Ed.2d 787 (1968).

The Court found that the statutory purpose of the limitation was to control, though not altogether to prohibit, expansion of electric service. *Id.* at 9, 88 S.Ct. 651. From this authority and our own review of the legislative history we find no support for the argument that the amendment restricts TVA in constructing the facilities involved in this case.

In the *Hardin* case the Supreme Court also stated a rule for review of power service area determinations of TVA which, while formulated for a different task, serves to strengthen our view of TVA's authority to exercise eminent domain. The Court stated that "the determination of the TVA Board is entitled to acceptance unless it lies outside the range of permissible choices contemplated by the statute. * * * " *Id.* at 8, 88 S.Ct. at 656. We have found that the TVA has statutory authority to acquire by condemnation the easement here involved. We further find that the coal-conveyor system is a permissible choice of means for supplying coal to the particular steam plants concerned here from the Camp Breckinridge Reserves. We do not imply that there may not be limitations on the eminent domain power of TVA other than those mentioned above relating to navigation and flood control and the transmission of electricity. For it is conceivable that a proposed project could be so remote either in purpose or location from the region served and the means contemplated by the TVA Act as to be beyond the authority of TVA. We hold only that the present exercise of power does not exceed the limits of the Act.

The judgments of the district court in Actions 20,846 and 20,867 are, therefore, affirmed.