COUNTY OF MARIN ET AL. *v.*
UNITED STATES ET AL.

No. 415.   Argued April 9, 1958.—Decided May 19, 1958.

*Spurgeon Avakian* argued the cause for appellants. With him on the brief was *Leland H. Jordan.*

*Robert W. Ginnane* argued the cause for the United States and the Interstate Commerce Commission, appellees. With him on the brief were *Solicitor General Rankin* and *Assistant Attorney General Hansen.*

*Allan P. Matthew* argued the cause and filed a brief for the Golden Gate Transit Lines et al., appellees.

MR. JUSTICE CLARK delivered the opinion of the Court.

At issue here is the exclusive and plenary authority of the Interstate Commerce Commission to approve a transaction in which Pacific Greyhound Lines, a motor carrier subsidiary of the Greyhound Corporation,[1] would transfer its operations in the San Francisco Bay area to Golden Gate Transit Lines, a subsidiary of Pacific Greyhound organized by it for that purpose. Pacific Greyhound would receive all Golden Gate capital stock in exchange for the operating rights, certain equipment, and an amount in cash. Appellants, two counties in the area and their respective commuter associations, opposed the transaction and challenged the power of the Commis-

---

[1] A merger of Pacific Greyhound and Greyhound, pending when the instant proceedings were before the Commission, No. MC–F–573, has since been consummated.

sion to authorize it,[2] but the Commission asserted jurisdiction and, on certain terms and conditions, approved the plan on the merits. 65 M. C. C. 347. A three-judge District Court, in which appellants sought to set aside the order, held that the Commission had jurisdiction under § 5 (2)(a) of the Interstate Commerce Act.[3] 150 F. Supp. 619. In view of the importance of the jurisdictional question and its impact on federal-state relations, we noted probable jurisdiction. 355 U. S. 866 (1957). We conclude that the proposed transaction is beyond the scope of Commission power under § 5 (2)(a).[4]

At the time of the application, Pacific Greyhound was a motor common carrier of passengers in seven western and southwestern States under certificates issued by the

---

[2] Certain divisions of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, representing employees of Pacific Greyhound, also opposed the application, and joined appellants in seeking to set aside the Commission's order in the District Court. However, the complaint was later dismissed as to the union for reasons not material here.

[3] Section 5 (2)(a): "It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b)—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise . . . ." 41 Stat. 481, as amended, 49 U. S. C. § 5 (2)(a).

[4] Our disposition makes unnecessary any consideration of appellants' alternative contention, namely, that the District Court abused its discretion in denying a motion by appellants to amend their complaint.

Interstate Commerce Commission. In combination with members of the Greyhound system and other lines, it provided joint through service to and from more distant areas of the country. In California, the extensive services of Pacific Greyhound included the operations in the San Francisco Bay area which are involved here. These routes are within 25 or 30 miles of the city, extending north into Marin County, east into Contra Costa County, and south on the Peninsula. Measured in terms of revenue, only 5.7% of the traffic is in interstate movement; 94.3% is intrastate, largely commuter.

The corporate transaction for which Commission approval was sought was conceived in an environment of financial difficulties plaguing the Bay area operations. The service consistently was operated at a loss, and Pacific Greyhound to some extent blamed the rate-making practices and policies of the California Public Utilities Commission. In proceedings for commutation rate increases over these routes, for example, the State Commission had held that Pacific Greyhound's applications should be determined in light of total revenues from all intrastate operations in California. *Pacific Greyhound Lines, Fares,* 50 Cal. P. U. C. 650. This the company deemed to be an unjustified subsidization of the local losses with profits from unrelated operations.[5]

The transfer in question admittedly was designed to escape, upon approval of the Interstate Commerce Commission, the practices and policies of the State Commission. Golden Gate was incorporated in 1953, but had

___

[5] In 1952 Pacific Greyhound unsuccessfully sought approval from the State Commission for the transfer of local operations between San Francisco and Marin County to an operator who offered to invest $200,000 in working capital. The State Commission, finding the proposed transfer "adverse to the public interest," denied the application. *Pacific Greyhound Lines, Certificate Transfer,* 52 Cal. P. U. C. 2, 7.

engaged in no business activity and was not a carrier. Under the agreement, arrived at early in 1954, Pacific Greyhound would transfer to Golden Gate substantially all interstate and intrastate operating rights in the Bay area, $150,000 in cash, and certain equipment.[6] Golden Gate would in turn issue all of its capital stock to Pacific Greyhound. The result is obvious: for rate-making purposes before the State Commission, the deficit-ridden local operation, after the split-up of operating rights into separate corporations, would be forced to stand on its own—or collapse.

Although it did not formally intervene, the State Commission filed its views regarding the transaction with the Interstate Commerce Commission. It was stated that the proposed transfer of "local" operations was wholly unnecessary, would create questionable expense, and would tend to inject confusion into intrastate rate fixing. Further, the State Commission feared that Golden Gate's resulting capital structure would be of "questionable soundness."

The Interstate Commerce Commission conditioned its approval of the proposal on an increase in the cash consideration to $250,000, after the hearing officer had recommended disapproval of the plan in its entirety.

The congressional purpose in the sweeping revision of § 5 of the Interstate Commerce Act in 1940, enacting § 5 (2)(a) in its present form, was to facilitate merger and consolidation in the national transportation system.[7]

---

[6] This included 52 buses recently purchased by Pacific Greyhound under conditional sales contracts, 138 other buses in use in the system, and 194 cash fare boxes. Golden Gate was to assume payment of $982,566 on the new buses, and in addition was to pay Pacific Greyhound $173,394 for its equity therein.

[7] See S. Rep. No. 433, 76th Cong., 1st Sess. 28–32; H. R. Rep. No. 1217, 76th Cong., 1st Sess. 6, 12, 17; H. R. Rep. No. 2016, 76th

In the Transportation Act of 1920 the Congress had directed the Commission itself to take the initiative in developing a plan "for the consolidation of the railway properties of the continental United States into a limited number of systems," 41 Stat. 481, but after 20 years of trial the approach appeared inadequate. The Transportation Act of 1940 extended § 5 to motor and water carriers, and relieved the Commission of its responsibility to initiate the unifications. "Instead, it authorized approval by the Commission of carrier-initiated, voluntary plans of *merger* or *consolidation* if, subject to such terms, conditions and modifications as the Commission might prescribe, the proposed transactions met with certain tests of public interest, justice and reasonableness . . . ." (Emphasis added.) *Schwabacher* v. *United States,* 334 U. S. 182, 193 (1948). In order to avoid the delays incident to approval by each State through which a company operated, the Congress provided for effectuation of Commission-approved plans "without invoking any approval under State authority." [8] In short, the result of the Act was a change in the *means,* while the *end* remained the same. The very language of the amended "unification section" [9] expresses clearly

Cong., 3d Sess. 61; H. R. Rep. No. 2832, 76th Cong., 3d Sess. 68–69. See the historical outline of the "consolidation" provisions in *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, 315 (1954) (appendix).

[8] Section 5 (11): "The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power . . . to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority . . . ." 54 Stat. 908, 49 U. S. C. § 5 (11).

[9] See S. Rep. No. 433, 76th Cong., 1st Sess. 28.

the desire of the Congress that the industry proceed toward an integrated national transportation system through substantial corporate simplification. Subject to approval and authorization of the Commission, § 5 (2)(a) makes lawful the consolidation or merger of two or more carriers; the purchase or lease of property, or acquisition of control, of one carrier by another; and the acquisition of control of a carrier by a noncarrier.[10]

In determining whether the Commission had jurisdiction in this case, we must examine the proposed transaction in light of the congressional purpose and statutory language. The Commission and the companies regard the transaction as an "acquisition" of Golden Gate by Pacific Greyhound, within the language of § 5 (2)(a) authorizing Commission approval ". . . for any carrier . . . to acquire control of another through ownership of its stock or otherwise." We think it is clear that this contemplates an acquisition, by one carrier, of another *carrier*. Golden Gate, a mere corporate shell without property or function, can by no stretch of the imagination be deemed a "carrier." Even if we look beyond Golden Gate's present status, however, and view the plan at its consummation, we find that the alleged "acquisition" amounts to little more than a paper transaction. In reality the carriers propose a split-up—something beyond the purpose and language of § 5 (2)(a). The operating rights which now are solely those of Pacific Greyhound would be divided with Golden Gate; where now there is one carrier, there would be two. Pacific Greyhound's control would be dissipated and its functions dismembered, in the hope of escaping certain practices of the State Commission.

There may or may not, in fact, be financial or operational justification for the proposed transaction; that

---

[10] See note 3, *supra*.

question is not before us. We consider only the applicability of § 5 (2)(a) as a ground for Commission jurisdiction, and in so doing the question narrows to "the nature of the change in relations between the companies." *Alleghany Corp.* v. *Breswick & Co.*, 353 U. S. 151, 169 (1957). For reasons we have stated, the nature of that change here eliminates this transaction from the "acquisition" language of § 5 (2)(a).

Our holding does not create a vacuum in regulation. In cases where the transaction is not within § 5, the Commission nevertheless may assert jurisdiction over the transfer of *interstate* operating rights under § 212 (b) of the Act.[11] Although the operations sought to be transferred here were predominantly suburban-commuter in nature, they involved at least some traffic in interstate movement, serviced under certificates issued by the Interstate Commerce Commission; the transfer of these certificates must be Commission-approved. See *Atwood's Transport Line—Lease—John A. Clarke,* 52 M. C. C. 97, 105–108, where the Commission discussed the distinction between § 5 and § 212 (b). The transfer of intrastate rights here will, of course, be subject to approval of the State Commission. Far from being a void in regulation, this will invoke the authority of the body most directly concerned with the local operations. This is not to say that the Interstate Commerce Commission could never have jurisdiction over the transfer of intrastate operating rights along with the interstate operations of a carrier. The test is whether the transaction comes within the terms of § 5 (2)(a), authorizing the exercise of exclusive and plenary jurisdiction.

---

[11] Section 212 (b): "Except as provided in section 5, any certificate or permit may be transferred, pursuant to such rules and regulations as the Commission may prescribe." 49 Stat. 555, as amended, 54 Stat. 924, 49 U. S. C. § 312 (b).

Finally, we are referred to certain cases in the Commission as evidence that prior administrative practice supports the sustaining of § 5 (2)(a) jurisdiction here. *Gehlhaus and Hollobinko—Control,* 60 M. C. C. 167; *Takin—Purchase—Takin Bros. Freight Line, Inc.,* 37 M. C. C. 626; *Consolidated Freightways, Inc.—Control—Consolidated Convoy Co.,* 36 M. C. C. 358; *Columbia Motor Service Co.—Purchase—Columbia Terminals Co.,* 35 M. C. C. 531. While the interpretation given a statute by those charged with its application and enforcement is entitled to considerable weight, it hardly is conclusive. *United States* v. *Missouri Pacific R. Co.,* 278 U. S. 269, 280 (1929). The Commission practice as evidenced by these cases is, in our opinion, insufficient to outweigh the apparent congressional purpose and the clear language of the statute—especially in this delicate area where the sustaining of federal jurisdiction leads, by statute, to the complete ouster of state authority.[12]

While the original application to the Commission for approval of the transaction is not a part of the record on appeal, it appears from the briefs that such application contained an alternative prayer for approval of the certificate transfers under § 212 (b). Therefore, the judgment is reversed and the case is remanded for proceedings in conformity with this opinion.

*It is so ordered.*

Mr. Justice Frankfurter, Mr. Justice Burton, Mr. Justice Harlan, and Mr. Justice Whittaker would affirm the judgment, substantially for the reasons given in the opinion of the District Court, 150 F. Supp. 619.

---

[12] See note 8, *supra.*