**The GREYHOUND CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**GREYHOUND LINES, INC., Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. Nos. 42084, 44758, 48613, 47518,**
**C-70-330.**

United States District Court,
N. D. California.

Feb. 5, 1971.

Gordon M. Weber, John B. Lowry, Robert A. Blum, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., Martin A. Schainbaum, Asst. U. S. Atty., Tax Division, San Francisco, Cal., for defendant.

ORDER APPROVING PLAINTIFFS'
FINDINGS OF FACT AND CON-
CLUSIONS OF LAW, ETC.

HARRIS, District Judge.

The above captioned consolidated suits are brought by the Greyhound Corporation and Greyhound Lines, Inc. under 26 U.S.C. §§ 6416 and 6421 for the refund of diesel fuel excise taxes paid under 26 U.S.C. § 4041, for part of the year 1957 and each of the years 1958 through 1965.

Plaintiffs' proposed findings of fact portray the factual background accurate-

ly and in minute detail. The uncontradicted evidence presented at the trial and under the Partial Agreed Statement of Facts and Specification of Remaining Issues of Fact tends to establish practically all of the relevant facts.

The unresolved issue, therefore, is whether Greyhound's two types of scheduled passenger service, consisting of mainline service and local service, are to be treated separately for the purposes of the 60% test governing the excise tax refund as Greyhound contends, or whether Greyhound's scheduled passenger service, including both mainline service and local service, is to be treated as a unit as the Government contends.

The following succinct statement referring specifically to the 60% test clarifies the basic issue:

The 60% test issue arises under § 6421(b) (2) in the following manner: For any calendar quarter, a local transit system qualifies for the refund only if it collects a sufficient amount of "commuter fare revenue." Whether the amount of commuter fare revenue is sufficient is determined by a fraction which must equal at least 60% for Greyhound to be entitled to a refund. The numerator of the fraction is "commuter fare revenue." The parties agree on the numerator of the fraction. Commuter fare revenue is defined precisely in § 6421(d) (2) and is not in issue in this case, the parties having stipulated that Greyhound's commuter fare revenue set forth in Agreed Statement, Paragraph 20, for Fourth Quarter/1963 is commuter fare revenue within this statutory definition. Agreed Statement, Paragraph 21.

However, the parties do not agree on the denominator of the fraction. Greyhound contends that the denominator is the revenue from the local transit operations of Greyhound. The United States contends that the denominator is the revenue from the local transit operations and intercity operations of Greyhound.

Under § 6421(b) (2), if the fraction is less than 60% no refund is due; if the fraction is 60% or more, a refund measured by the fraction is due. In the present case, there is no substantial dispute that if the 60% test means that commuter fare revenue must be at least 60% of revenue from Greyhound's local transit operations, as Greyhound contends, then a refund in the amount claimed by Greyhound is due; and, on the other hand, the parties agree that if the 60% test means that commuter fare revenue must be 60% of revenue from all of Greyhound's operations, both local and intercity, as the United States contends, no refund whatsoever is due Greyhound. Agreed Statement, Paragraph 29. The pertinent computations for Fourth Quarter/1963 are set forth in Agreed Statement, Paragraphs 25–27. (Plaintiffs' Reply Brief, p. 4, l.14 to and incl. p. 5, l.14)

It is manifest from the testimony adduced at trial and the Partial Agreed Statement of Facts and the elaborate briefs filed by the respective parties, that Greyhound operates two separate types of service, mainline and local. Public Service Coordinated Transport v. United States, 367 F.2d 417, 177 Ct.Cl. 337 (1966); see also, *Plaintiffs' Exhibit 9* "Local Operations." The detailed testimony of the several trial witnesses produced by plaintiffs make it abundantly clear that Greyhound's local service meets the criteria in Exhibit 9.

Plaintiffs have successfully met and sustained the burden of proof in the clear and convincing exposition of fact and the delineation of legal principles as applicable.

The United States vigorously contends that Greyhound is nevertheless a single, unified and integrated transportation system. However, there is no persuasive evidence, either oral or documentary, to support this contention.

County of Marin v. United States, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958), is demonstrative that the Supreme Court does not consider Grey-

hound's local operations to be part of a single bus system.

Accordingly, plaintiffs' proposed findings of fact and conclusions of law as lodged with this Court are, and each of them is, approved.

The entry of the proposed judgments is subject to the agreement of the parties that the necessary computation of the amounts will be settled by the parties prior to the entry of any judgment.

Accordingly, the entry of appropriate judgments is deferred pending determination of principal and interest.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above entitled consolidated actions came on regularly for trial on the 13th and 16th of November, 1970, before the Court without a jury, the Honorable George B. Harris presiding. Plaintiffs were represented by Gordon M. Weber and John B. Lowry of the firm of McCutchen, Doyle, Brown & Enersen and defendant was represented by James L. Browning, Jr., Esq. through Martin A. Schainbaum, Esq., Assistant United States Attorney.

Evidence, both oral and documentary, was introduced on behalf of the respective parties and the consolidated causes were submitted for decision upon the filing of post-trial briefs and proposed findings of fact and conclusions of law on behalf of the respective parties.

In conformity with Rule 52 Federal Rules of Civil Procedure and the order regularly made and entered on the 5th day of February, 1971, approving plaintiffs' proposed findings of fact and conclusions of law, this Court has made the following findings of fact, all of which have been either agreed to by counsel for the respective parties or proved by testimony submitted at the trial of the above entitled cause and exhibits which have been made part of the record.

## FINDINGS OF FACT

1. Civil Nos. 42084, 44758, 48613, 47518 and C–70–330 are suits brought by The Greyhound Corporation and Greyhound Lines, Inc. under 26 U.S.C. §§ 6416 and 6421 for the refund of diesel fuel excise taxes paid under 26 U.S.C. § 4041 for part of the year 1957 and each of the years 1958 through 1965. (AS ¶ 1, 2.) [1]

2. The Plaintiff in Civil Nos. 42084, 44758 and 48613 (for the years 1957 through 1963) is The Greyhound Corporation, a Delaware corporation. (AS ¶ 2; Tr. P 19 L 24.)

3. The Plaintiff in Civil Nos. 47518 and C–70–330 (for the years 1964 and 1965) is Greyhound Lines, Inc., a California corporation and a wholly owned subsidiary of The Greyhound Corporation. (Under a reorganization effective December 31, 1963, The Greyhound Corporation transferred its transportation business to its subsidiary, Greyhound Lines, Inc.) (AS ¶ 2; Tr. P 19 L 12–21.)

4. Western Greyhound Lines Division ("Western Division") and Eastern Greyhound Lines Division ("Eastern Division") were two divisions of The Greyhound Corporation for years prior to 1964 and were two divisions of Greyhound Lines, Inc. for the years 1964 and 1965. (AS ¶ 3.)

5. Until 1964, the business of The Greyhound Corporation was almost entirely providing bus transportation services. The exclusive business of Greyhound Lines, Inc. during the years 1964 and 1965 was providing bus transportation services. (Tr. P 20 L 23–25; P 21 L 1–2, 6–12.)

6. Reference hereafter to "Greyhound" refers to The Greyhound Cor-

[1]. Reference herein to "AS" refers to the parties' "Partial Agreed Statement of Facts and Specifications of Remaining Issues of Fact." Reference to "Ex." refers to Exhibits made part of the record. Reference to "Tr." refers to the reporter's transcript.

poration for the years prior to 1964 and to Greyhound Lines, Inc. for the years 1964 and 1965.

7. For each of the taxable periods in question,[2] Greyhound operated scheduled common carrier public passenger land transportation service along regular routes ("Scheduled Passenger Service") throughout the United States. Western Division operated Scheduled Passenger Service in the Western part of the United States. Eastern Division operated Scheduled Passenger Service in the Eastern part of the United States. (AS ¶ 14, Tr. P 74 L 2–7; P 77 L 9–17.)

8. All Scheduled Passenger Service provided by Greyhound and its Western and Eastern Divisions consisted of transportation by motor buses using diesel fuel. (AS ¶ 14.)

9. Pursuant to 26 U.S.C. § 4041(a) (2), Greyhound, on behalf of its Western Division, filed excise tax returns and reported and paid excise taxes on diesel fuel due under 26 U.S.C. § 4041(a) (2) to the District Director of Internal Revenue in San Francisco, California, as follows: (AS ¶ 4; Ex. 1A.)

| Taxable Period | Return | |
| --- | --- | --- |
| | Filing Date | Tax Paid |
| **1957** | | |
| 4–1 to 5–31 | 7–31–57 | $93,121.14 |
| **1958** | | |
| 1st Qtr. | 5–6–58 | 164,001.24 |
| 2nd Qtr. | 8–4–58 | 185,350.20 |
| 3rd Qtr. | 10–5–58 | 223,151.83 |
| 4th Qtr. | 2–6–59 | 187,898.34 |
| **1959** | | |
| 1st Qtr. | 5–5–59 | 173,667.42 |
| 2nd Qtr. | 8–6–59 | 205,505.70 |
| 3rd Qtr. | 11–6–59 | 204,012.30 |
| 4th Qtr. | 2–9–60 | 255,202.56 |
| **1960** | | |
| 1st Qtr. | 5–9–60 | 237,094.44 |
| 2nd Qtr. | 8–1–60 | 253,617.56 |
| 3rd Qtr. | 11–10–60 | 300,967.11 |
| 4th Qtr. | 2–6–61 | 260,376.88 |
| **1961** | | |
| 1st Qtr. | 5–3–61 | 238,018.88 |
| 2nd Qtr. | 8–7–61 | 257,859.56 |
| 3rd Qtr. | 11–3–61 | 306,433.24 |
| 4th Qtr. | 2–6–62 | 264,779.76 |
| **1962** | | |
| 1st Qtr. | 5–4–62 | 235,210.44 |
| 2nd Qtr. | 8–7–62 | 252,169.20 |
| 3rd Qtr. | 11–5–62 | 297,129.12 |
| 4th Qtr. | 2–8–63 | 246,529.28(a) |
| **1963** | | |
| 1st Qtr. | 5–7–63 | 335,387.70 |
| 2nd Qtr. | 8–8–63 | 382,836.59 |
| 3rd Qtr. | 11–6–63 | 453,913.55 |
| 4th Qtr. | 2–4–64 | 372,034.81 |
| **1964** | | |
| 1st Qtr. | 5–5–64 | 348,786.38 |
| 2nd Qtr. | 8–4–64 | 385,207.11 |
| 3rd Qtr. | 11–4–64 | 463,470.56 |
| 4th Qtr. | 2–4–65 | 364,370.43 |
| **1965** | | |
| 1st Qtr. | 5–4–65 | 333,490.03 |
| 2nd Qtr. | 8–3–65 | 379,220.09 |
| 3rd Qtr. | 11–8–65 | 458,047.84 |
| 4th Qtr. | 2–4–66 | 365,441.82 |

(a) Less credit of $24.55 for Lakeshore Lines, Inc., resulting in net tax paid of $246,504.73.

10. Pursuant to 26 U.S.C. §§ 6416 and 6421 Greyhound, on behalf of its Western Division, filed claims for refund of excise taxes paid under 26 U.S. C. § 4041(a) (2) with the District Director of Internal Revenue at San Francisco, California, at the times and in the amounts shown below. The action taken on these claims is also shown below. Greyhound has not received any payment of any of these amounts and has brought these actions to recover the amounts claimed. (AS ¶ 5, Ex. 1–A.)

| Taxable Period | Refund Claim | | Action Taken |
| --- | --- | --- | --- |
| | Filing Date | Amount Claimed | Date Rejected |
| **1957** | | | |
| 4–1 to 5–31 | 7–26–60 | $2,787.39 | (a) |

2. All factual statements hereafter refer to each of the taxable periods in question unless otherwise indicated.

**48**

| Taxable Period | Refund Claim | | Action Taken |
| | Filing Date | Amount Claimed | Date Rejected |
| --- | --- | --- | --- |
| **1958** | | | |
| 1st Qtr. | 2–10–61 | 4,137.17 | 11–7–61 |
| 2nd Qtr. | 2–10–61 | 4,167.45 | 11–7–61 |
| 3rd Qtr. | 2–10–61 | 4,035.07 | 11–7–61 |
| 4th Qtr. | 2–10–61 | 4,132.85 | 11–7–61 |
| **1959** | | | |
| 1st Qtr. | 3–12–62 | 3,961.07 | 7–10–62 |
| 2nd Qtr. | 3–12–62 | 4,000.41 | 7–10–62 |
| 3rd Qtr. | 3–12–62 | 3,989.93 | 7–10–62 |
| 4th Qtr. | 3–12–62 | 8,195.43 | 7–10–62 |
| **1960** | | | |
| 1st Qtr. | 2–12–63 | 8,051.18 | (a) |
| 2nd Qtr. | 2–12–63 | 8,140.95 | (a) |
| 3rd Qtr. | 2–12–63 | 8,223.47 | (a) |
| 4th Qtr. | 2–12–63 | 9,121.90 | (a) |
| **1961** | | | |
| 1st Qtr. | 2–12–63 | 8,257.11 | (a) |
| 2nd Qtr. | 2–12–63 | 8,501.30 | (a) |
| 3rd Qtr. | 2–12–63 | 8,673.27 | (a) |
| 4th Qtr. | 2–12–63 | 8,722.99 | (a) |
| **1962** | | | |
| 1st Qtr. | 11–13–63 | 7,752.56 | 12–10–63 |
| 2nd Qtr. | 11–13–63 | 7,881.69 | 12–10–63 |
| 3rd Qtr. | 11–13–63 | 7,945.18 | 12–10–63 |
| 4th Qtr. | 11–13–63 | 8,213.12 | 12–10–63 |
| **1963** | | | |
| 1st Qtr. | 12–17–65 | 8,736.11 | 2–24–66 |
| 2nd Qtr. | 12–17–65 | 8,519.66 | 2–24–66 |
| 3rd Qtr. | 12–17–65 | 8,784.20 | 2–24–66 |
| 4th Qtr. | 12–17–65 | 9,194.99 | 2–24–66 |
| **1964** | | | |
| 1st Qtr. | 11–16–66 | 9,034.86 | 2–24–67 |
| 2nd Qtr. | 11–16–66 | 9,132.74 | 2–24–67 |
| 3rd Qtr. | 11–16–66 | 9,230.32 | 2–24–67 |
| 4th Qtr. | 11–16–66 | 9,595.35 | 2–24–67 |
| **1965** | | | |
| 1st Qtr. | 12–23–66 | 9,520.32 | 12–15–67 |
| 2nd Qtr. | 12–23–66 | 9,189.69 | 12–15–67 |
| 3rd Qtr. | 12–23–66 | 9,106.72 | 12–15–67 |
| 4th Qtr. | 12–23–66 | 9,481.58 | 12–15–67 |

(a) Not rejected nor disallowed.

11. Greyhound's Scheduled Passenger Service consists of two separate and distinct types of service: mainline bus service and local bus service. Greyhound's mainline service carries long distance intrastate and interstate passengers. Greyhound's local service carries short-distance passengers, almost exclusively in intrastate transportation, who generally are persons traveling on a regular basis to and from home and work, home and school, and home and shopping. (Tr. P 22 L 18–21; Ex. 9, Ex. 11, P 1.)

12. The following criteria, which summarize Exhibit 9, determine whether bus service is mainline or local: frequency of service; frequency of stops; equipment used; methods of paying fares; operating speeds; baggage facilities; method of paying drivers; drivers layover; scheduling of connecting buses; seasonal pattern of travel; internal accounting. (Ex. 9; Tr. P 25 L 6–25; P 26 L 1–2.)

13. The criteria referred to in paragraph 12 are generally accepted and used in the bus transportation industry to determine what constitutes local and mainline service. (Tr. P 25 L 20–23.)

14. Greyhound used the criteria referred to in paragraph 12 to determine whether its Scheduled Passenger Service constituted its mainline or local service. (AS ¶ 23; Tr. P 26 L 18–21.)

15. Using the criteria referred to in paragraph 12, Greyhound determined that the following Scheduled Passenger Service constituted its local service in the fourth quarter of 1963, which is a representative quarter for all taxable periods here involved: (AS ¶ 23; Ex. 8.)

### WESTERN DIVISION

San Francisco Bay Area

#### Marin County (North)

San Francisco—Mill Valley
(Ferry Building Terminal)
San Francisco—Ross Valley
(Ferry Building Terminal)
San Francisco—Novato
(Ferry Building Terminal)
San Francisco—Mill Valley
(7th Street Terminal)
San Francisco—Ross Valley
(7th Street Terminal)
San Francisco—Novato
(7th Street Terminal)
San Francisco—Bolinas

#### Contra Costa County (East)

San Francisco—Concord—Pittsburg—Antioch
(7th Street Terminal)
San Francisco—Concord
(Transbay Terminal)
Oakland—Concord
Oakland—Vallejo
San Francisco—Vallejo—Napa
San Francisco—Vallejo—(Express)

WESTERN DIVISION

San Francisco Bay Area—Continued

Peninsula (South)

San Francisco—San Jose (Bayshore)
San Francisco—Palo Alto (Bayshore)
San Francisco—Redwood City
San Francisco—San Jose (Express)
San Francisco—Pedro
San Francisco—Half Moon Bay

Southern California

Long Beach—Santa Monica
San Diego—Mexican Border
Niland—Calexico
San Diego—Miramar
Ft. Ord Army Base

Seattle

Seattle—Everett
Seattle—Auburn
Seattle—Tacoma

EASTERN DIVISION

Washington, D. C. Area

Washington, D. C.—Annapolis, Md.
Baltimore, Md.—Washington, D. C.

Cleveland Area

Cleveland, Ohio—Medina, Ohio
Cleveland, Ohio—Oberlin, Ohio
Cleveland, Ohio—Ashtabula, Ohio—Conneaut, Ohio
Cleveland, Ohio—Sandusky, Ohio
Cleveland, Ohio—Akron, Ohio
Cleveland, Ohio—Canton, Ohio
Canton, Ohio—No. Canton, Ohio

Other Areas

Detroit, Mich.—Ann Arbor, Mich.
Ypsilanti, Mich.—Ann Arbor, Mich.
Cincinnati, Ohio—Harrison, Ohio
Cincinnati, Ohio—Morrow, Ohio
Columbus, Ohio—Westerville, Ohio
Columbus, Ohio—Mt. Vernon, Ohio
Indianapolis, Ind.—Frankfort, Ind.
Pittsburgh, Pa.—Uniontown, Pa.
Portland, Maine—Augusta, Maine
Winthrop, Maine—Augusta, Maine

16. In terms of gross revenue, the bulk of Greyhound's local service during the fourth quarter of 1963 was concentrated in the San Francisco Bay Area and several other major urban areas, in approximately the following percentages: (Ex. 4, 5.)

| San Francisco Bay Area | 64.3% | |
| All other California areas | 10.8% | |
| Seattle Area | 6.6% | |
| Western Division subtotal | | 81.7% |
| Cleveland area | 8.7% | |
| Washington, D. C. area | 8.0% | |
| All other areas | 1.6% | |
| Eastern Division subtotal | | 18.3% |
| TOTAL: | | 100.0% |

17. The local Scheduled Passenger Service set forth in paragraph 15 was properly chosen pursuant to the criteria referred to in paragraph 12, as set forth in detail below, and constituted Greyhound's local service in the fourth quarter of 1963.

18. All Greyhound's local Scheduled Passenger Service set forth in paragraph 15 substantially met all of the criteria for determining what constitutes local service. (Tr. P 40 L 10–14; P 115 L 16–18.)

19. No Scheduled Passenger Service operated by Greyhound in the fourth quarter of 1963 other than that designated in paragraph 15 constituted local service. (Tr. P 40 L 15–20; P 115 L 12–15.) All Greyhound's Scheduled Passenger Service which is not local service is mainline service and met the criteria for mainline service. (Tr. P 28 L 6–11; P 29 L 13–16; P 31 L 6–12; P 33 L 16–17; P 34 L 6–9; P 35 L 8–11; P 36 L 6–13; P 37 L 5–7; P 38 L 10–13; P 39 L 10–15; P 40 L 1–5; P 110 L 1–3, 16–20; P 111 L 7–9, 22–23; P 113 L 2–3, 11–12, 16–25; P 114 L 1, 6–7, 15–16, 23–25; P 115 L 4–8.)

*Frequency of Service:*

20. With respect to frequency of service, the distinction between local and mainline service is as follows:

(a) Local bus service provides frequent schedules in the peak morning hours, taking passengers to work, with buses running very frequently (as often as every 5 or 10 minutes) on individual routes. Reduced service is provided between peak hours with buses running every one half hour to every two hours. Increased service, taking passengers home from work, is provided in the late afternoon peak hours, with buses running as often as in the morning peak period. Local service operates primarily Monday through Friday with substantial reduction on Saturdays, Sundays and holidays. (Tr. P 30 L 13–21; P 111 L 1–8.)

(b) Mainline service normally provides only two to four trips a day on a

particular route. Mainline service provides the same scheduled service, every day during the week. (Tr. P 30 L 4–12.)

21. Greyhound's local service meets the criteria for frequency of service described in paragraph 20, as follows:

(a) Greyhound's local service from Marin County to San Francisco follows a commute pattern. Service is heavily concentrated in the morning peak hours of 6–8 a. m. with buses on individual routes running every 5 to 10 minutes during that period into San Francisco. After the peak hours, local service from Marin County to San Francisco operates approximately every 30 to 60 minutes. In the evening peak hours between 4 and 6 p. m. buses run from San Francisco to Marin County every 2 to 10 minutes. Local service between Marin County and San Francisco substantially decreases on Saturdays, Sundays and holidays. (Tr. P 119 L 6–21; P 157 L 7–8, L 18–20; P 158 L 1–8; P 160 L 7–8.)

(b) Greyhound operates a similar commute schedule between Contra Costa County and San Francisco, but operates buses at a higher frequency in the mornings, running buses more often than once a minute along some routes. In the evenings, Greyhound local buses leave the San Francisco commute terminal for Contra Costa County as fast as they are loaded. (Tr. P 124 L 18–25; P 151 L 3–25; P 152 L 1–23.)

(c) Greyhound's Peninsula service follows the commute pattern described in paragraph (a). (Tr. P 154 L 14–25; P 155 L 1–6.)

(d) Greyhound's Seattle local service followed a similar commute pattern. (Tr. P 132 L 19–25; P 133 L 1–16.)

(e) Greyhound's Long Beach and San Diego-Mexican Border bus service runs frequently (as often as every 15 minutes) throughout the day, with street corner stops every few blocks along the whole route. (Tr. P 126 L 6–24; P 128 L 20–24.)

(f) Greyhound's Niland operation was much smaller than any previously described. It primarily carried farm laborers to and from work on a commute-type schedule. (Ex. 4; Tr. P 127 L 20–22; P 128 L 5–6.)

(g) Greyhound's military base operations (Fort Ord and Miramar) operated at peak hours coinciding with the off-duty times of servicemen traveling between the base and adjacent communities. (Tr. P 130 L 12–20; P 131 L 20–23.)

(h) Greyhound's local service between Washington and Baltimore and Washington and Annapolis operated on a commute pattern similar to the San Francisco area local service, except that peak hour passengers traveled to and from Washington. (Tr. P 42 L 24–25; P 43 L 1–20; P 50 L 11–25; P 51 L 1–9.)

(i) Service on the Cleveland routes followed a commute pattern similar to that in San Francisco. A number of Cleveland lines served only commuters coming to Cleveland in the morning and leaving Cleveland in the afternoon, with no service in-between the peak hours. (Tr. P 52 L 23–25; P 53 L 1–3, 21–25; P 54 L 1–15; P 55 L 6–25; P 57 L 15–25; P 58 L 1–6, 17–25; P 59 L 1–4, 20–25; P 60 L 1–2.)

(j) Greyhound's Detroit-Ann Arbor-Ypsilanti service was substantially the same as its Long Beach or San Diego-Mexican Border service, with buses operated frequently throughout the day for people commuting between Detroit and Ypsilanti and the University of Michigan at Ann Arbor. (Tr. P 66 L 2–21.)

(k) Greyhound's other Eastern Division local service operations consisted of one or two round trips a day, Monday–Friday, for commuters traveling to and from a metropolitan center. (Tr. P 61 L 7–25; P 62 L 1–6; P 63 L 8–25; P 64 L 1–5.)

*Frequency of Stops:*

22. With respect to frequency of stops, the distinction between local and mainline operations is as follows:

Local buses make frequent stops en route to pick up and discharge passengers. Stops may occur every few blocks.

Mainline buses go for long distances, and may go 30 to 200 miles between stops. (Tr. P 29 L 25; P 30 L 1–3; P 111 L 3–4; P 119 L 24–25.)

23. Greyhound's local service meets the criteria for frequency of stops, as follows:

(a) In the San Francisco Bay Area, Greyhound's buses providing local service from Marin County to San Francisco generally stop at street corners every one quarter to one half mile in the suburban communities they serve, to pick up and discharge passengers, and also make frequent stops at street corners within the City of San Francisco to pick up and discharge passengers. The same is true for buses providing local service between the Peninsula and San Francisco. In Contra Costa County, Greyhound buses stop in the suburbs every one quarter to one half mile; these buses discharge passengers in San Francisco at a special commute terminal. (Tr. P 119 L 22–25; P 120 L 1–3; P 123 L 2–8; P 125 L 11–14; P 152 L 24–25; P 153 L 1–16; P 161 L 2–14; P 162 L 2–10; P 163 L 17–24; P 166 L 18–25; P 167 L 1–13.)

(b) Greyhound buses providing local service in the Seattle area had the same frequency of stops as buses operating in the San Francisco area. (Tr. P 133 L 17–22.)

(c) Greyhound buses in local service in the Long Beach and San Diego areas provide frequent street corner stops, picking up and discharging passengers approximately every quarter mile along the whole length of the routes. Buses on Greyhound's military base local service provide service between the bases and adjacent communities. (Tr. P 126 L 16–18; P 129 L 12–13; P 130 L 24–25; P 132 L 1–3.)

(d) Greyhound buses providing local service in the Washington D. C. area makes stops substantially similar to those described for the San Francisco Bay Area. The same is true for buses which provide local service between Cleveland and its adjacent suburbs. The same is true for all other local services in East-

ern Division which provide one or two round trips a day for commuters, and also is true for the Ann Arbor-Detroit local service. (Tr. P 44 L 1–3; P 51 L 15–17; P 53 L 10; P 54 L 18; P 56 L 8; P 58 L 8; P 60 L 5; P 62 L 14–17; P 65 L 3–7; P 66 L 22–25; P 67 L 1–2.)

*Equipment:*

24. With respect to equipment, the distinction between local and mainline operations is as follows:

Buses used in local service differ from buses used in mainline service in their physical characteristics. Buses used in local service generally are either specially designed transit buses or are older second line mainline buses which no longer can provide mainline service. (Tr. P 32 L 17–25; P 33 L 1–21; P 111 L 14–22.)

25. Greyhound's local service meets the criteria for equipment as follows:

(a) Greyhound's transit and mainline buses have the following characteristics: Transit buses are 102 inches wide; mainline buses are 96 inches wide. Transit buses carry 50–55 passengers; mainline buses carry 38–43 passengers. Transit buses have nonreclining low-back seats; mainline buses have reclining, soft seats. Transit buses have accordian type doors 29–31 inches wide; mainline buses have sedan type doors 23–24 inches wide. The aisles in transit buses are 18½–24 inches wide; the aisles in mainline buses are 15 inches wide. Transit buses have overhead grab rails for standees; mainline buses do not have grab rails. Transit buses do not have any luggage facilities; mainline buses have baggage compartments underneath the seating platform. Transit buses have cash fare boxes; mainline buses do not. Transit buses do not have lavatory facilities; mainline buses do provide such facilities. (Tr. P 172 L 1–25; P 173 L 1–5; P 174 L 1–25; P 175 L 1–25; P 176 L 1–9.)

(b) Greyhound's second line buses are nearing the end of their useful life. Because of their age, second line mainline buses are operated about 40,000 miles per year; they cannot operate as first

line buses, which run 120,000–130,000 miles per year. (Tr. P 33 L 16–21.)

(c) Most of Greyhound's buses used in providing local service between Marin County and the Peninsula and San Francisco were transit buses; the rest were second line mainline buses. Greyhound used second line mainline buses in providing local service between Contra Costa County and San Francisco, pursuant to an order of the California Public Utilities Commission. All these second line mainline buses have been converted by adding cash fare boxes. (Tr. P 156 L 3–7; P 154 L 9–13; P 150 L 12–25; P 151 L 1–2; P 175 L 17–22.)

(d) Buses used in providing local service in the Seattle area were second line mainline buses and transit buses. (Tr. P 132 L 12–18.)

(e) Buses used in providing local service in the San Diego and Long Beach areas and military base operations were transit buses. (Tr. P 126 L 5; P 128 L 19; P 130 L 7; P 131 L 14.)

(f) Buses used in providing local service in Eastern Division were all second line mainline buses except that 15 transit buses were used in the Washington D. C. area and 5 in the Cleveland area. (Tr. P 32 L 17–25; P 33 L 1–21.)

*Fare Collection*:

26. With respect to fare collection, the distinction between local and mainline operations is as follows:

On local service, fares are paid directly to the driver or deposited in a cash fare box. Commutation tickets are a predominant part of the fares used. On mainline operators, fares are generally not paid to the driver directly nor deposited in a fare box; single trip tickets are generally used; commutation tickets are rarely used. (Tr. P 27 L 8–20; P 28 L 9–11.)

27. Greyhound's local service meets the criteria for fare collection as follows:

Almost all buses in Western Division's local service have cash fare boxes. All drivers in Eastern Division's local service accept cash fares. Commutation tickets are heavily used in all Greyhound's local service. (Tr. P 27 L 24–25; P 28 L 1–11; P 109 L 21–23.)

*Zone Fares*:

28. With respect to zone fares, the distinctions between local and mainline operations are as follows:

In local service, fares may be based on the number of zones through which a person travels. On mainline service fares are always based on the points at which a passenger boards and leaves a bus. (Tr. P 28 L 15–25; P 29 L 1–3.)

29. Greyhound's local service meets the criteria for zone fares as follows:

Zone fares are used on Greyhound's local service in Western Division. (Tr. P 110 L 14–15.)

*Operating Speed*:

30. With respect to operating speed, the distinction between local and mainline operations is as follows:

The scheduled operating speed of a local bus is much slower than that of an intercity bus. Local buses travel in restricted speed areas, travel in heavy traffic, and make frequent stops to pick up and discharge passengers. Intercity buses travel long distances on freeways at high speeds. (Tr. P 34 L 3–9.)

31. Greyhound's local service meets the criteria for operating speed as follows:

Substantially all Greyhound's local bus service operates at lower speeds for the reasons described above. (Tr. P 34 L 12–14; P 112 L 19–24.)

*Baggage Facilities*:

32. With respect to baggage facilities, the distinction between local and mainline operations is as follows:

Local service does not provide baggage checking facilities; intercity mainline bus service provides baggage facilities. (P 34 L 18–25; P 35 L 1, 9–11.)

33. Greyhound's local service meets the criteria for baggage facilities as follows:

No Greyhound transit buses have facilities for baggage and thus no baggage

checking is offered with these buses. Greyhound's second line mainline buses used on local service have baggage compartments but Greyhound does not offer baggage checking facilities on its local bus service. (Tr. P 34 L 21–25; P 35 L 1; P 113 L 7–10.)

*Drivers' Pay:*

34. With respect to drivers' pay, the distinction between local and mainline operations is as follows:

Drivers of local buses are generally paid on an hourly, or guaranteed daily basis. Drivers of mainline buses are generally paid on a mileage basis. (Tr. P 35 L 16–25; P 36 L 1–2, 6–17; P 113 L 17–19.)

35. Greyhound's local service meets the criteria for drivers' pay as follows:

All Greyhound's drivers of local buses in Western Division are paid on an hourly basis. All Greyhound's drivers of local buses in Eastern Division are paid a guaranteed minimum daily wage. (Tr. P 36 L 6–17; P 113 L 17–19, 22–23.)

*Drivers' Layover:*

36. With respect to drivers' layover, the distinction between local and mainline operations is as follows:

Drivers of local buses do not make runs which prevent them from returning home each day after work. Drivers of mainline intercity buses frequently make runs which prevent them from returning home each day after work. (Tr. P 36 L 21–25.)

37. Greyhound's local service meets the criteria for drivers' layover as follows:

Drivers on all of Greyhound's local service are able to return home each day after work. (Tr. P 36 L 21–25; P 37 L 1–4; P 114 L 2–7.)

*Connecting Schedules:*

38. With respect to connecting schedules, the distinction between local and mainline operations is as follows:

Local bus service is not scheduled to make connections with other buses. Mainline buses are scheduled to make connections with other intercity buses. (Tr. P 37 L 11–25; P 38 L 1–4.)

39. Greyhound's local service meets the criteria for connecting schedules as follows:

None of Greyhound's local bus service is scheduled to connect with other buses. (Tr. P 38 L 5–9; P 114 L 8–12.)

*Seasonal Variation:*

40. With respect to seasonal variation, the distinction between local and mainline operations is as follows:

The number of passengers traveling on mainline buses shows a sharp increase during the summer vacation periods. The number of passengers using local buses is generally stable during the year. (Tr. P 38 L 17–25; P 39 L 1–4.)

41. Greyhound's local service meets the criteria for seasonable variation as follows:

The number of passengers using Greyhound's local service is generally stable throughout the year, but mainline traffic varies seasonally. (Tr. P 39 L 5–9; P 114 L 20–25.)

*Internal Accounting:*

42. With respect to internal accounting, Greyhound's local and mainline operations are distinguished as follows:

Greyhound does not maintain passenger mile statistics for its local operations; Greyhound does maintain passenger mile statistics for its mainline operations. (Tr. P 39 L 19–25; P 40 L 1–5; P 115 L 4–9.)

*Miscellaneous:*

43. Greyhound provides mass transit service. In the last quarter of 1963, Western Division carried over 4½ million passengers on its buses providing local service. In the same period, Eastern Division carried over 700,000 passengers on buses providing local service. (Ex. 4, 5.)

44. None of Greyhound's local service operations go beyond the terminal points designated on the routes in paragraph 15. (Tr. P 108 L 19–21.)

45. Greyhound has sold a number of its local transit operations to other operators of local transit service. (Tr. P 24 L 1–4; P 134 L 6–7.)

*Financial Operations:*

46. Greyhound has consistently lost money on its local transit operations. (Tr. P 23 L 21–24.)

47. Under the California Public Utilities Commission accounting rules, any refund paid to Greyhound on diesel fuel excise taxes would be accounted for as decreasing Greyhound's costs of its local operations. (Ex. 11, P 121.)

*60% Test:*

48. In the fourth quarter of 1963, Greyhound had total revenue of $2,369,-200 from its local transit service and had commuter fare revenue defined under 26 U.S.C. § 6421(a) (2) of $1,553,523. Greyhound's revenue from all its bus operations in the fourth quarter of 1963 was $62,511,433. (AS ¶ 20.)

49. For the fourth quarter of 1963, Greyhound properly calculated the 60% test of 26 U.S.C. § 6421(b) (2) as follows:

$$\frac{\$1,553,523}{\$2,369,200}$$

which yields a percentage of 65.572%. (AS ¶ 25.)

50. For the fourth quarter of 1963, Greyhound on behalf of its Western Division properly computed the refund due under 26 U.S.C. §§ 6416 and 6421 as follows: (AS ¶ 27.)

| | | |
|---|---|---|
| (a) | Gallons of diesel fuel used by Western Division in said period | 701,137 gallons |
| (b) | Multiplied by two cents | x 2¢ |
| | | $14,022.74 |
| (c) | Multiplied by percentage in paragraph 49 | x 65.572% |
| (d) | Amount of refund due | $ 9,194.99 |

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties.

2. During the years 1957 through 1963, inclusive, The Greyhound Corporation operated a local transit system which consisted of all of The Greyhound Corporation's local bus service providing scheduled common carrier public passenger land transportation service along regular routes. ("Scheduled Passenger Service").

3. During the years 1964 and 1965, Greyhound Lines, Inc. operated a local transit system which consisted of all of Greyhound's Lines, Inc.'s local bus service providing Scheduled Passenger Service.

4. The Greyhound Corporation and Greyhound Lines, Inc. correctly determined their revenue from local bus service providing Scheduled Passenger Service, and their commuter fare revenue for purposes of the 60% test set forth in 26 U.S.C. § 6421(b) (2).

5. The denominator of the 60% test fraction set forth in 26 U.S.C. § 6421(b) (2) consists of Greyhound's revenue from its local bus service providing Scheduled Passenger Service, and does not include any of Greyhound's revenue from its other Scheduled Passenger Service.

6. In calculating the 60% test of 26 U.S.C. § 6421(b) (2) Greyhound properly used the following fraction:

$$\frac{\text{Commuter fare revenue (defined in 26 U.S.C. § 6421(b) (2))}}{\text{Passenger fare revenue derived by Greyhound from its local bus service providing Scheduled Passenger Service.}}$$

7. For each of the taxable periods in question, Greyhound satisfied the 60% test of 26 U.S.C. § 6421(b) (2) and is entitled to a refund of diesel fuel excise taxes pursuant to 26 U.S.C. § 6416(b) in the amounts claimed.

## OPINION AND ORDER DENYING RECOVERY OF INTEREST ON JUDGMENT

The above captioned consolidated suits were brought by the Greyhound Corporation and Greyhound Lines, Inc. for the

refund of diesel fuel excise taxes paid for part of the year 1957 and for each of the years 1958 through 1965. On February 5, 1971, this court filed its "Order Approving Plaintiffs' Findings of Fact and Conclusions of Law, Etc.," finding in plaintiffs' favor, but reserving the entry of appropriate judgments pending determination of principal and interest.

By their joint stipulation dated May 18, 1971, the parties agree that the amount of refund of tax due in these consolidated cases is a total of $248,418.-03, pursuant to the Findings and Conclusions approved by this court on February 5, 1971. The parties do not agree as to whether interest is due on the above amount as a matter of law, but they do agree on the amount of interest, a total of $93,809.38, if any is due.

█ The availability of interest under the facts of these cases depends on which of two sections of the Internal Revenue Code is applicable. Twenty-six U.S.C. § 6611(a), a general provision, provides that,

> (a) Rate.—Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 percent per annum.

The second section is a more specific provision dealing with credits and refunds of taxes such as those involved here, 26 U.S.C. § 6416(b):

> (b) Special cases in which tax payments considered overpayments.—Under regulations prescribed by the Secretary or his delegate, credit or refund (without interest) shall be allowed or made in respect of the overpayments determined under the following paragraphs:
>
> \*   \*   \*   \*   \*   \*

Plaintiffs concede that the "without interest" language of § 6416(b) bars the recovery of interest dating from the time of the initial tax payments, but argue that § 6416(b) should not bar the recovery of interest dating from the wrongful rejection of the refund claims involved in the instant cases.

Plaintiffs have presented a plausible argument to support their claim to interest, but they are unable to adduce any case authority or legislative history on which to base their position. On the other hand, the cases of Bulova Watch Company v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961) and General Motors Corp., Frigidaire Div. v. United States, 292 F.2d 502, 155 Ct.Cl. 267 (1961), while not dispositive, do tend to support the position of the Government.

Moreover, the "without interest" proviso of § 6416(b) admits of no exception: on refunds such as those presently before the court, no interest is to be awarded. Although § 6611(a) provides for the payment of interest in the general situation, it must give way before the specific reference in § 6416(b). As summarized by one leading commentator,

> Where general and specific provisions appear in the same statute in seeming contradistinction, a specific clause, which qualifies and supplies an exception to a general clause, should control. It is familiar law that a specific statute controls over a general one "without regard to priority of enactment." Specific terms prevail over the general in the same or another statute, which otherwise might be controlling. [Footnotes omitted.] Mertens, Law of Federal Income Taxation § 3.13 at 32–33 (1969 John L. Malone revised ed.).

Accordingly, plaintiffs are not entitled to interest on any sums recovered herein as tax refunds. It is so ordered.