**OREGON PUBLIC UTILITY COMMISSION,** Petitioner,

v.

**INTERSTATE COMMERCE COMMISSION,** Respondent.

No. 91–70276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1992.

Decided Nov. 13, 1992.

Keith Kutler, Asst. Atty. Gen., Salem, Or., for petitioner.

Evelyn G. Kitay, Office of the Gen. Counsel, I.C.C., Washington, D.C., for respondent.

Before: BEEZER, NOONAN, and TROTT, Circuit Judges.

JOHN T. NOONAN, Circuit Judge:

The Oregon Public Utility Commission (OPUC) seeks review of an order of the Interstate Commerce Commission (ICC) exempting a transfer of operating rights under 49 U.S.C. § 11343. The case—of first impression in this circuit—involves the interpretation of the statute. We affirm the ruling of the ICC.

## PROCEEDINGS

On August 23, 1990 Maddox Transfer and Storage, Inc. (Maddox) and Washington Trucking, Inc. (WTI) filed with the ICC a joint notice of exemption from 49 U.S.C. § 11343 pursuant to regulations of the ICC, 49 C.F.R. § 1186. WTI, a common carrier domiciled in Everett, Washington, held ICC authority for service to Alaska, Texas, and the eleven western states. Maddox, a common carrier domiciled in Portland, Oregon, held ICC authority for the 48 continental states and OPUC authority for intrastate operations in Oregon. On August 23, 1990 Maddox and WTI executed a purchase and sales agreement by which WTI acquired Maddox's ICC operating authority for common carrier service throughout the continental United States with the exception of household goods, commodities in bulk and certain explosives. WTI also acquired a portion of Maddox's OPUC certificate authorizing irregular route service within 50 miles of Portland in the carriage of general commodities except for household goods. The combined operating revenues of the two carriers exceeded $2 million.

The ICC granted the exemption, subject to public comment. OPUC objected, as did two competing motor carriers, Gresham Transfer, Inc. and Fedderley–Marion Freight Lines, Inc. The ICC did not rule on the objections within 60 days of the publication of notice of the exemption in the ICC register. The exemption, therefore, became effective. 49 C.F.R. § 1186.7. The objections of OPUC and the two carriers were then treated by the ICC as a request for the revocation of the exemptions.

On February 8, 1991, the ICC ruled on the objections, which it characterized as "essentially on jurisdictional grounds," *i.e.*, the transaction did not result "in a merger, consolidation, or acquisition of control of one carrier by another" and therefore did not fall within the reach of 49 U.S.C. § 11343(a)(2). OPUC further contended that exemption would violate the National Transportation Policy set out in 49 U.S.C. § 10101(a)(1)(E), requiring the ICC to cooperate with the states. OPUC noted that on October 18, 1989 it had denied an application by WTI for common carrier authority to haul cement and lime throughout Oregon. OPUC contended that the sole purpose of the transaction with Maddox was for WTI to obtain similar intrastate authority.

The ICC ruled that the transaction fell within section 11343(a)(3) and denied that the ICC was violating the National Transportation Policy. The ICC also found that two subordinate objections made by the two competing carriers were without merit:

1) "the dormancy" of operating rights, the ICC observed, was "no longer an issue in transfer proceedings"; and 2) the conditional safety rating of Maddox was irrelevant to the transfer. The objectors' request for an oral hearing was denied because there were "no facts in dispute."

OPUC, but not the competing carriers, filed a petition on April 24, 1991 for review by this court of the ICC's decision.

### ANALYSIS

49 U.S.C. § 11341(a) gives the ICC "exclusive authority" over the matters dealt with in the subchapter that follows. "A carrier or corporation participating in or resulting from a transaction approved by or exempted by the Commission ... may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority." *Id.* This general preemptive statue is followed by section 11343, entitled "Consolidation, merger, and acquisition of control." As to carriers subject to the ICC, the statute provides that only with the ICC's approval can there be "a purchase, lease, or contract to operate property of another carrier by any number of carriers." 49 U.S.C. § 11343(a)(2). The ICC is then given authority to exempt from the requirement of approval any transaction involving motor carriers if the ICC finds that 1) its approval is not necessary to carry out the National Transportation Policy set out in 49 U.S.C. § 10101, and 2) that the transaction "is of limited scope" or approval by the ICC "is not needed to protect shippers from the abuse of market power." 49 U.S.C. § 11343(e).

Acting under the authority given by subsection (e), the ICC in 1984 issued a blanket exemption to motor carriers, subject to opposition by their employees or objections on antitrust grounds. *Exemption of Certain Transactions Under 49 U.S.C. § 11343,* 133 M.C.C. 449 (1984) *(Exemption)*. *See also* 49 C.F.R. §§ 1186.1, 1186.8.

OPUC's principal contention is that the acquisition of operating authority is not a transaction that fits within the literal meaning of section 11343(a)(2). To sustain this position OPUC argues, first, that operating authority is not "property." As a matter of common usage, a certificate of operating authority is an asset of value and meets the common understanding of what constitutes property. As OPUC is forced to concede, for over fifty years the ICC has authorized the transfer of operating authority. *See Yellow Truck Lines, Inc.-Purchase-F & H Truck Lines, Inc.,* 35 M.C.C. 773, 776–77 (1940). Operating authority is property, whether it is transferred as a whole, as in *Yellow Truck,* or whether it is transferred partially as here. It is no less property because it is less than total.

But OPUC contends that the purpose of the statute is to give the ICC preemptive jurisdiction only where carriers are being united. OPUC points to the statute's title, "Consolidation, merger and acquisition of control." It adds that when the Supreme Court had occasion to construe the statute it found that the act was meant to promote the "unification" of carriers. *County of Marin v. United States,* 356 U.S. 412, 417, 78 S.Ct. 880, 883, 2 L.Ed.2d 879 (1958).

Neither argument succeeds. The title of a statute can be used to resolved ambiguity, but the title cannot control the plain meaning of a statute. *See Brotherhood of R.R. Trainmen v. Baltimore O.R.R. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1391–92, 91 L.Ed. 1646 (1947). The plain meaning of this statute is that the ICC may permit not only a consolidation, a merger or acquisition of complete control but also "a purchase" of property of another carrier. It is true that the statute lacks an "of" after "purchase", but this omission must be seen as inadvertent, occurring when the statute was codified. The omission of "of" after "purchase" carries no meaning. *Minnesota Transp. Regulation Bd. v. United States,* 966 F.2d 335, 339 (8th Cir.1992). The statute is rightly read as governing "a purchase ... [of] property of another carrier."

The Supreme Court in *County of Marin* identified one purpose of the statute. There is nothing in the Court's opinion, which deals with the creation by a carrier of a corporate shell, that indicates that the "unification" of carriers is the sole purpose of the statute. OPUC's contention for this

interpretation is refuted by the very words of the statute providing for something less than total unification of the carriers, which, in the statute's contemplation, may lease or contract to operate property of one another. *See* 49 U.S.C. § 11343(a)(2). OPUC's contention makes section 11343(a)(2) surplusage because the other portions of the statute provide for consolidation or merger "into one corporation." 49 U.S.C. § 11343(a)(1).

OPUC does have its own surplusage argument, contending that transfers of operating authority are governed by 49 U.S.C. § 10926, "Transfer of Certificates and Permits." The ICC, however, understands its authority under this section to apply to carriers with combined annual revenues of under $2 million. The ICC's reasoning is compelling. Congress has specified that only transactions involving carriers with annual revenues in excess of $2 million are subject to section 11343. 49 U.S.C. § 11343(d)(1). It is, therefore, completely consistent with section 11343(a) to treat smaller transactions under section 10926.

We join two sister circuits in rejecting the attack of state regulatory agencies on similar exemptions. *North Alabama Express, Inc. v. ICC*, 971 F.2d 661 (11th Cir. 1992); *Minnesota Transp. Regulation Bd. v. United States, supra.*

OPUC's fallback position is that the ICC failed significantly to show the comity required by the National Transportation Policy. The statutory expression of this policy requires the ICC "to cooperate with each State and the officials of each State on transportation matters," 49 U.S.C. § 10101(a)(1)(E), and "to cooperate with the States on transportation matters for the purposes of encouraging the States to exercise intrastate regulatory jurisdiction" in accordance with the objectives of the National Transportation Policy. 49 U.S.C. § 10101(a)(3)(A). It is true that the ICC appears to have given very little thought to cooperation with Oregon and has done very little in this case to encourage Oregon to exercise regulatory jurisdiction. The ICC in its brief notes that it is not bound to defer to Oregon. But of course it is one thing to possess preemptive power and another to exercise it with some respect for

the legitimate concerns of a state. The ICC contends that in its *Exemption* decision it has determined that exemption for the motor carriers will reduce regulatory barriers, reduce industry costs, improve carrier efficiency, and increase competition. *Exemption*, 133 M.C.C. at 453–54. The ICC says that taking into account these considerations satisfied the National Transportation Policy.

▮ When the ICC grants an exemption from a portion of the Interstate Commerce Act, the ICC needs to take into account only the purpose of that portion of the statute from which exemption is granted. *Village of Palestine v. ICC*, 936 F.2d 1335, 1338–40 (D.C.Cir.1991), ·cert. denied — U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 773 (1992). Otherwise, the ICC would be faced with the impossible task of reconciling a variety of different objectives of the National Transportation Policy. For example, the encouragement of sound economic conditions among carriers required by 49 U.S.C. § 10101(a)(1)(C) may not always coincide with the goal of cooperating with the states required by 49 U.S.C. § 10101(a)(1)(E). The statute governing consolidation, merger, and acquisition of control is clearly intended to promote the goal of competition. Accordingly, exemption from the statute may be granted by the ICC if it finds that exemption promotes rather than hinders competition. It is not necessary in granting an exemption here that the ICC encourage the exercising of regulatory jurisdiction by, or cooperate with, a state.

We do not find presented in this appeal the contention that WTI's acquisition of the interest rights was a mere "sham." OPUC in its objection to the Maddox–WTI exemption did not raise this issue, but in response to the objection Maddox and WTI denied that their transaction was a sham. It is doubtful that their reply put the issue before the ICC, which did not rule on it. In any event, no showing of sham was made. Unlike *North Alabama Express, supra,* WTI acquired interstate authority that it did not already possess. In *North Alabama Express* the transferee already possessed interstate authority and the transferor possessed multiple certificates for in-

terstate transport, so that the transferee already possessed the authority purportedly conveyed and the transferor continued to possess interstate authority after the transfer. In "these unique circumstances" the Court of Appeals labeled the transactions a "sham," which the ICC could not use as a basis for rewriting the intrastate certificate. *North Alabama Express,* 971 F.2d at 665. In our case there was a change in interstate commerce because WTI acquired interstate authority it did not have prior to the transaction.

OPUC also now objects to the transfer of allegedly dormant rights of Maddox and to the "trafficking" in certificates. These objections were not made by OPUC before the ICC and are not appropriately before us on appeal.

The decision of the ICC is AFFIRMED.