971 F.2d 661
 NORTH ALABAMA EXPRESS, INC., an Alabama Corporation; AAA
Cooper Transportation, Inc., an Alabama
Corporation, Petitioners,
Alabama Public Service Commission; Milan Express, Inc., Intervenors,
v.
The INTERSTATE COMMERCE COMMISSION and the United States of
America, Respondents,
Averitt Express, Inc.; Deaton, Inc., Intervenors.
 No. 91-7662.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 3, 1992.
As Amended on Denial of Rehearing June 30, 1993.*
 
 George M. Boles, Weaver, Boles & Elmore, Birmingham, Ala., for Neely and North Alabama Exp.
 Robert C. Black, Montgomery, Ala., for AAA Cooper.
 Suellen Powers Lambert, Alabama Public Service Com'n, Montgomery, Ala., for Alabama Public Service Com'n, intervenor.
 Gerald D. Colvin, Jr., Bishop, Colvin, Johnson & Kent, Birmingham, Ala., for Milan Exp., Inc., intervenor.
 Michael Martin, Secretary, I.C.C., and Robert B. Nicholson, U.S. Atty. Gen., Dept. of Justice, Washington, D.C., for I.C.C. and the U.S.
 Robert L. Baker, Buck & Baker, Nashville, Tenn., for Averitt Exp., Inc., intervenor.
 Kim D. Mann, Shawn, Berger & Mann, Washington, D.C., for Deaton, Inc., intervenor.
 Petition for Review of an Order of the Interstate Commerce Commission.
 Before EDMONDSON, Circuit Judge, RONEY*, and GIBSON**, Senior Circuit Judges.
 FLOYD R. GIBSON, Senior Circuit Judge:
 
 
 1
 Milan Express, Inc., North Alabama Express, Inc., and the Alabama Public Service Commission appeal the Interstate Commerce Commission's ("ICC") order authorizing the transfer of intrastate trucking authority from Deaton, Inc. to Averitt Express, Inc. We set aside the ICC's order insofar as it approves the transfer of this intrastate authority.
 
 I. BACKGROUND
 
 2
 In late December 1990 or early January 1991, Averitt Express entered into a contract to purchase a portion of Alabama Certificate 695 from Deaton. Certificate 695 permits transportation of general commodities in intrastate commerce in certain parts of Alabama. Deaton and Averitt Express filed an application with the Alabama Public Service Commission, seeking its approval of the proposed transfer as required by Alabama law. Several motor carriers, including Milan Express, filed their opposition to the proposed transfer.
 
 
 3
 In February 1991, Deaton and Averitt Express filed a notice of exemption under 49 U.S.C. § 11343 (1988) with the ICC. The transfer to be exempted was a sale of interstate authority the ICC had previously issued to Deaton; specifically, Docket No. MC-11207 (sub 574x), which authorized Deaton to transport general commodities between points in Alabama, Georgia, Louisiana, Mississippi, and Tennessee. Ancillary to this transaction, the parties sought approval of the same transfer of intrastate authority proposed to the Alabama Public Service Commission. Milan Express, Neely Truck Line, North Alabama Express, and AAA Cooper (hereinafter collectively referred to as "the objectors") opposed the ICC's approval of the transfer of the intrastate operating rights. The ICC concluded it had exclusive jurisdiction over the proposed transaction, and that its jurisdiction included the power to approve the transfer of intrastate authority even if the transfer violated state law.[1] The objectors then petitioned for review in this court. See 28 U.S.C. § 2321 (1988).
 
 II. DISCUSSION
 A. Statutory Concerns
 
 4
 The ICC has, in exempting this transaction from closer scrutiny, relied upon 49 U.S.C. § 11343 (1988). This section applies to a variety of transactions requiring ICC approval; the category of transactions pertinent to this appeal is described as any "purchase, lease, or contract to operate property of another carrier by any number of carriers." 49 U.S.C. § 11343(a)(2) (1988). Section 11343(e)(1) grants the ICC authority to
 
 
 5
 exempt a person, class of persons, transaction, or class of transactions from the merger, consolidation, and acquisition of control provisions of this subchapter if the [ICC] finds that--
 
 
 6
 (A) the application of such provisions is not necessary to carry out the transportation policy of section 10101 of this title; and
 
 
 7
 (B) either (i) the transaction is of limited scope, or (ii) the application of such provisions is not needed to protect shippers from the abuse of market power.
 
 
 8
 Pursuant to § 11343(e)(1), the ICC has exempted all transactions described in § 11343(a)(1)-(5) between nonbus motor carriers. Exemption of Certain Transactions under 49 U.S.C. 11343, 133 M.C.C. 449 (1984). In so doing, the ICC determined only two issues needed to be considered on a case by case basis (issues relating to antitrust and issues relating to employee protection), and limited valid objections to these topics.[2] Once the ICC approves or exempts a transaction, "[a] carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." 49 U.S.C. § 11341(a).
 
 
 9
 The objectors contend the exemption does not apply because a purchase of operating rights does not qualify as a "purchase, lease, or contract to operate property of another carrier" within the meaning of § 11343(a)(2). The objectors further contend the ICC may exempt only those transactions in which one carrier acquires another carrier through purchase, consolidation, or merger. However, the objectors' position is defeated by the text of § 11343. As noted above, § 11343(e)(1) allows the ICC to define and exempt classes of transactions described in § 11343(a). Section 11343(a)(2) describes three different transactions between carriers: the purchase of property, the lease of property, and a contract to operate property. The terms of this section do not appear limited to combinations and mergers. See Minnesota Transportation Regulation Board v. United States, 966 F.2d 335, 338-339 (8th Cir.1992) (hereinafter "MTRB"); Redden v. I.C.C., 956 F.2d 302, 304 n. 2 (D.C. Cir.1992) (Thomas, J.). We also note that § 11343(a)(1) directly addresses consolidations and mergers; if § 11343(a)(2) were read to apply only to consolidations and mergers, it would have no independent meaning. We decline to ascribe a redundant meaning to the statute.
 
 
 10
 The objector's second statutory argument relies upon the Supreme Court's decision in County of Marin v. United States, 356 U.S. 412, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958). In that case, Pacific Greyhound Lines sought to transfer its San Francisco area operations to Golden Gate Transit Lines. Golden Gate was a wholly-owned subsidiary of Pacific Greyhound created solely for the purpose of acquiring Pacific Greyhound's San Francisco operations. Id. at 413, 78 S.Ct. at 881.[3] The ICC approved the transaction pursuant to its authority under 49 U.S.C. § 5(2)(a), the predecessor to § 11343,[4] and specifically categorized the transaction under language requiring ICC approval when a "carrier ... acquire[s] control of another through ownership of its stock or otherwise." Id. at 418, 78 S.Ct. at 883.[5] The Court ruled the transaction was not governed by § 5(2)(a) because that section "contemplate[d] an acquisition, by one carrier, of another carrier," id. (emphasis in original), and went on to opine that "Golden Gate, a mere corporate shell without property or function, can by no stretch of the imagination be deemed a 'carrier.' " Id. Thus, the Court's true concern was focused on whether Golden Gate was a carrier, thereby enabling it to qualify under the language applicable to one carrier's acquisition of another carrier. The Court did not address the language that now appears at § 11343(a)(2), nor did it hold that the other provisions now appearing in § 11343 apply only to consolidations and mergers.
 
 
 11
 The objectors' third statutory argument is based on section titles: § 11343 is entitled "Consolidation, merger, and acquisition of control," while § 10926 is entitled "Transfers of certificates and permits." Based on these titles, the objectors contend § 10926 is clearly the "more-applicable" statute. However, as the Eighth Circuit recently observed with regard to this argument, "[s]ection and subchapter titles cannot alter the plain meaning of a statute; they can only assist in clarifying ambiguity." MTRB, 966 F.2d at 339 (citing Brotherhood of Railroad Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947)). Many of the transactions described in § 11343(a) involve consolidations and mergers; other transactions, however, do not. Because the text of the statute is clearly not limited to mergers and consolidations, the section title cannot be invoked to so limit the statute's scope. See id. at 333.[6] We conclude the ICC was correct in applying § 11343 to this transaction.
 
 
 12
 Finally, the objectors contend that even if the ICC generally has the statutory authority to approve changes in intrastate certificates, it lacks authority to do so in this case because the proposed transaction is a sham designed solely to divest the Alabama Public Service Commission of its authority in this matter. In support of its point, the objectors point out Deaton and Averitt Express possess multiple certificates allowing interstate transport, and the proposed transfer of interstate authority will not enlarge Averitt Express' ability to transport in interstate commerce, nor will it reduce Deaton's authority to transport in interstate commerce. In other words, the authority purportedly conveyed by Deaton to Averitt Express is already possessed by Averitt Express, and Deaton has more than one source of authority for the areas covered by this transaction. Under these unique circumstances, we agree with the objectors that the ICC cannot use a "sham" transaction as a basis for rewriting intrastate certificates.
 
 
 13
 "Congress did not issue the ICC a hunting license for state laws and contracts that limit a railroad's efficiency unless those laws or contracts interfered with carrying out an approved merger." City of Palestine, Texas v. United States, 559 F.2d 408, 414 (5th Cir.1977), cert. denied sub nom. Missouri Pacific R.R. v. City of Palestine, Texas, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978).[7] Because the ICC was not given general power to nullify all state laws creating a burden on interstate commerce, the ICC can "set aside state law restraints only insofar as necessary to assure the effectuation of approved transactions." Id. at 415. Similarly, Congress did not give the ICC power to create or transfer intrastate authority absent some connection between the proposed transaction, the intrastate authority, and interstate commerce. Had Congress intended to allow the ICC to grant wholly intrastate authority, it would have done so with greater clarity. E.g., 49 U.S.C. § 10922(c)(2) (1988) (relating to passenger carriers). Moreover, even when Congress has granted the ICC the power to pre-empt state laws, rules, or decisions, such power has not been unlimited: in all such cases, the ICC's power can be exercised only if it is somehow necessary to improve or facilitate interstate commerce. E.g., 49 U.S.C. § 10922(c)(2)(A) (1988) (ICC can grant intrastate authority to passenger carriers only if the applicant/carrier already has interstate authority over the proposed route and if the ICC finds the applicant/carrier is "fit, willing, and able to provide the intrastate transportation"); id. § 11501(e)(1)(B) (ICC may prescribe rates, rules, or practices relating to intrastate transportation when state refuses to do so if necessary to prevent discrimination against, or unreasonable burden on, interstate commerce). Consequently, we conclude § 11343 authorizes the ICC to order the transfer of intrastate authority only if the intrastate authority has some relationship with the change in interstate commerce resulting from the proposed transaction. In the case at bar, the intrastate authority has a relationship to the interstate routes, but no relationship to the change in interstate commerce simply because there is no change; there being no change in interstate commerce, the ICC is effectively approving nothing more than the transfer of intrastate authority.[8] Congress has not authorized this exercise of power.[9]
 
 B. Constitutional Concerns
 
 14
 The objectors contend that if § 11343 allows the ICC to authorize transfers of intrastate certificates in contravention of state law, the statute violates the Tenth Amendment. The Commerce Clause grants Congress the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Because the Tenth Amendment reserves only those powers not already delegated to the federal government, the Tenth Amendment has been violated only if § 11343 goes beyond the limits of Congress' power under the Commerce Clause. As the Supreme Court has explained, the states do retain a significant degree of authority as independent sovereigns, but
 
 
 15
 "[t]hey do so ... only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government. In the words of James Madison to the Members of the First Congress: "Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitution of the States."
 
 
 16
 Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 549, 105 S.Ct. 1005, 1016, 83 L.Ed.2d 1016 (1985) (quoting 2 Annals of Congress 1897 (1791)).[10] Thus, the real issue for resolution is whether § 11343 is within or beyond Congress' delegated powers under the Commerce Clause.
 
 
 17
 We have a limited basis for review of this matter. We "must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. This established, the only remaining question for judicial inquiry is whether 'the means chosen by [Congress are] reasonably adapted to the end permitted by the Constitution.' " Hodel v. Virginia Surface Mining & Reclamation Ass'n., 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)) (other citations omitted). Congressional action is not invalid merely because it grants the ICC powers over purely intrastate activity. See Garcia, 469 U.S. at 537, 105 S.Ct. at 1010; Hodel, 452 U.S. at 277, 281, 101 S.Ct. at 2360, 2362.
 
 
 18
 There can be no doubt that intrastate transportation has an effect on interstate transportation. Cf. Texas v. United States, 730 F.2d 339, 348 (5th Cir.) ("the regulation of intrastate railroad rates has a direct and substantial effect on interstate commerce."), cert. denied, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Interstate routes may not be profitable absent a carrier's ability to transport commodities between two or more points within a single state along the interstate route. For this reason, when one carrier purchases another carrier, the purchaser may legitimately desire to obtain all rights--whether they are interstate or intrastate--possessed by the seller. Similarly, if authority under an interstate certificate is being purchased, the purchaser may legitimately desire to obtain the intrastate routes for those states implicated by the interstate certificate. By allowing the ICC to approve these transactions, Congress has acted reasonably and in furtherance of its powers under the Commerce Clause. Cf. Texas v. United States, 730 F.2d at 349 (holding ICC's authority to pre-empt state decisions regarding intrastate railroad rates to be "a valid exercise of the commerce power."). Consequently, we conclude § 11343 does not exceed the boundaries of the Commerce Clause simply because it allows the ICC to authorize the transfer of intrastate certificates, even if the transfer violates state law.
 
 III. CONCLUSION
 
 19
 We conclude the ICC properly applied 49 U.S.C. § 11343 to this transaction, and that § 11343 grants the ICC the power to authorize the transfer of intrastate certificates, even if the transfer violates state law, if such action is related to the change in interstate commerce contemplated by the transaction. In granting the ICC this authority, Congress has not exceeded its powers under the Commerce Clause. Because the supposed interstate aspects of the transaction involved in the present case do not constitute a change in interstate commerce, the ICC lacked the power to approve or exempt the intrastate aspects of the transaction. To the extent that it permits the transfer of the intrastate routes, the ICC's ORDER is SET ASIDE.
 
 
 
 *
 The order on petition for rehearing is published at 996 F.2d 1072
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The ICC's decision is reported as Averitt Express, Inc.--Purchase (Portion) Exemption--Deaton, Inc., 7 I.C.C.2d 634 (1991)
 
 
 [2]
 The procedures for filing and objecting pursuant to this exemption are currently codified at 49 C.F.R. Part 1186 (1991)
 
 
 [3]
 Pacific Greyhound's San Francisco operations were losing money, and it had sought permission from the California Public Utilities Commission to increase rates for those routes. Permission was denied because "the State Commission had held that Pacific Greyhound's applications should be determined in light of total revenues from all intrastate operations in California." County of Marin, 356 U.S. at 415, 78 S.Ct. at 882. By transferring the operations, Pacific Greyhound hoped to force the State Commission to look only at the activities of the wholly owned subsidiary and stop viewing Pacific Greyhound's profitable routes as subsidizing the losses in San Francisco. Id. at 416, 78 S.Ct. at 882
 
 
 [4]
 The recodification did not effect any substantive changes to the statute. H.R.Rep. No. 1395, 95th Cong., 2d Sess. 4 (1978), reprinted in 1978 U.S.C.C.A.N. 3009, 3013; see also I.C.C. v. Brotherhood of Locomotive Engineers, 482 U.S. 270, 299 n. 12, 107 S.Ct. 2360, 2376 n. 12, 96 L.Ed.2d 222 (1987) (Stevens, J., concurring) (discussing 49 U.S.C. § 11341(a))
 
 
 [5]
 In the recodification, this language became what is now 49 U.S.C. § 11343(a)(3)
 
 
 [6]
 Our interpretation of § 11343 does not deprive § 10926 of all application. Section 11343 would not apply when the aggregate gross operating revenues of the carriers involved in the transaction was less than $2,000,000. 49 U.S.C. § 11343(d)(1). Section 11343 also would not apply when the transaction is not one specifically described in § 11343(a), as, for instance, when a non-carrier purchases a carrier
 
 
 [7]
 The decisions of the former Fifth Circuit are binding on this court. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc)
 
 
 [8]
 Though it is true the form of this transaction includes the transfer of rights to transport commodities in interstate commerce, the substance of this transaction effects no substantive change in either party's ability to transport in purely interstate commerce
 
 
 [9]
 Although not determinative of this issue, there is additional evidence of the "sham" nature of this transaction. Deaton and Averitt Express initially filed with the Alabama Public Service Commission and not with the ICC. This is undoubtedly due to the fact that their original contract covered only the sale of the intrastate routes. It was not until they met opposition before the Alabama Public Service Commission that the parties rewrote their agreement, filed with the ICC, and asked the Alabama Public Service Commission for permission to withdraw its still-pending application
 
 
 [10]
 Garcia went on to hold that "States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." South Carolina v. Baker, 485 U.S. 505, 512, 108 S.Ct. 1355, 1360-61, 99 L.Ed.2d 592 (1988) (plurality opinion). Though Garcia "left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment," id., the objectors have not alleged there were any defects in the political process